Francia Goodwin Coe KINGERY,
Plaintiff,

v.

CONTINENTAL OIL COMPANY,
Defendant.

No. EP–76–CA–60.

United States District Court,
W. D. Texas,
El Paso Division.

June 15, 1977.
As Amended June 16 and July 11, 1977.

John S. Birkelbach, William J. Mounce, Grambling, Mounce, Sims, Hardie & Harris, El Paso, Tex., for plaintiff.

William B. Browder, Jr., Stubbeman, McRae, Sealey, Laughlin & Browder, Midland, Tex., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SESSIONS, District Judge.

This cause having been tried before the Court without a jury on May 25 and 26, 1977, and the Court having considered the evidence and arguments of counsel for Plaintiff and Defendant hereby enters its Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. Plaintiff, Francia Goodwin Coe Kingery, is the legal owner of an undivided one-half royalty interest in a certain Oil, Gas and Mineral Lease, dated May 13, 1944, by and between Frank C. Goodwin, as Lessor, and W. R. Lokey, as Lessee, said lease being filed for record in Volume 103, Page 105 of the Deed Records of Live Oak County, Texas. Said interest was formerly owned by the State National Bank of El Paso, Trustee of the Francia Goodwin Coe Trust. Said trust agreement was terminated and all right, title and interest in the lease premises, including any legal rights and causes of action were conveyed and assigned to Francia Goodwin Coe Kingery.

2. Defendant, Continental Oil Company, is a successor in interest to W. R. Lokey and by virtue of said succession, Defendant is subject to all the terms and conditions of said lease agreement.

3. The lease agreement of May 13, 1944, between the predecessors in interest of the Plaintiff and the Defendant, is, and at all times since May 13, 1944 has been, in full force and effect.

4. The gas produced from the wells on the Goodwin lease has been sold and delivered by Defendant to Transcontinental Gas Pipeline Corporation for transportation in interstate commerce pursuant to a contract made between the Defendant and said pipeline company in 1949, amended in 1970.

5. The contract between Defendant and the Transcontinental Gas Pipeline Corporation executed in 1949, and the amendment of 1970 were entered into on terms and conditions which reasonable people would have formulated when contracting to buy and sell gas. The contract of 1949 and the amendment of 1970 contained reasonable provision for the price to be paid for the gas, escalation provisions concerning such price, and all other provisions of said agreement.

6. At the time of the contract in 1949, and the amendment in 1970, the only market for the gas produced from the Goodwin lease of May 13, 1944 (hereinafter referred to as the "Goodwin Lease"), and the only

market for gas of like quantity and quality in the area was in the interstate market. From 1972 to the present, had the gas from the Goodwin Lease not been dedicated to the interstate market, an intrastate market would have been available for that gas.

7. From the date of first production of gas from the Goodwin Lease to the present, the Defendant has paid to the Plaintiff a royalty based upon the amount realized from the sale of gas produced from the lease premises to Transcontinental Gas Pipeline Corporation.

8. In 1951 and 1952, Plaintiff's predecessors executed four division orders (Defendant's Exhibits B, C, D, and E). The division orders ratified the then existing contract between Defendant and Transcontinental Gas Pipeline Corporation. These division orders stated that the royalties on separator residue gas would be based on the price and terms received by the Defendant from the Transcontinental Gas Pipeline Corporation.

9. The contract between the Defendant and Transcontinental was amended on December 31, 1970, after which date no new division orders were executed by Plaintiff or her predecessors. Plaintiff has not ratified the provisions of the December 31, 1970 contract.

10. The gas produced from the lease premises since March 24, 1972 has been sold and is currently being sold off of the lease premises.

11. Plaintiff, by the terms of the Goodwin Lease, is entitled to receive a royalty payment from the Defendant based upon the market value at the well of gas produced and sold to Transcontinental.

11.a. Had gas from the Goodwin lease not been dedicated to the interstate market, an intrastate market would have been available for that gas from 1972 to the present.

12. The market value of gas at the well, for time period in question in this cause is as follows:
   A. For the year 1972, $.28/mcf.
   B. For the year 1973, $.55/mcf.
   C. For the year 1974, $1.24/mcf.
   D. For the year 1975, $1.85/mcf.
   E. For the year 1976, $1.90/mcf.
   F. For the year 1977, $2.00/mcf.

13. Plaintiff and her predecessors in title have not delayed for an unreasonable length of time the filing and prosecution of this suit for damages and payments of additional gas royalties.

## CONCLUSIONS OF LAW

1. Defendant sold the gas produced from the Goodwin Lease to Transcontinental off of the lease premises.

2. The four year statute of limitations of the State of Texas is applicable to Plaintiff's suit for recovery of additional gas royalties.

3. The Defendant has a legal obligation to pay to Plaintiff a royalty computed on the market value of the gas at the well for production from the Goodwin Lease since March 24, 1972.

4. The Defendant has the duty to pay Plaintiff a royalty computed on the market value of gas at the well for all gas produced from the Goodwin Lease from and after this litigation.

5. The contract between the Defendant and Transcontinental in 1949 and the amendment to that contract effected in 1970, and the price received by the Defendant from the sale of gas pursuant to the contract and amendment, have been regulated by the Federal Power Commission, pursuant to the Natural Gas Act, 15 U.S.C. § 717 et seq.

6. The payment of gas royalties to Plaintiff or her predecessors in title has not been and is not presently fixed by the provisions of the Natural Gas Act and/or the Rules and Regulations of the Federal Power Commission.

7. The market value at the well of the gas produced from the Goodwin Lease is established by evidence of specific intrastate sales of gas and contract negotiations for intrastate sale of gas in the immediate vicinity of the Goodwin Lease during the period from 1972 through the present.

8. At the time the gas produced from the Goodwin Lease became available to market, Defendant was obligated under the terms of that lease to then market the gas as a reasonably prudent operator.

9. A gas sales contract for the production and delivery of natural gas in interstate commerce is merely an executory contract for the sale of such gas, and does not constitute a completed sale and transfer of the rights and title to such gas in place.

10. The execution of division orders and the receipt, acceptance and retention of payments of gas royalties in the past by Plaintiff or her predecessors in title or interest do not constitute a ratification by Plaintiff or her predecessors in title of any payment of royalties made by the Defendant to the Plaintiff from March 24, 1972 to present.

11. Plaintiff is entitled to recover from Defendant the difference between the market value and the amount realized by Defendant for all gas produced from the Goodwin Lease during the period from March 24, 1972 to present.

12. Plaintiff is entitled to recover from the Defendant a royalty based upon market value of all gas produced from the Goodwin Lease from this date forward.

## MEMORANDUM OPINION AND ORDER

Plaintiff instituted this action to recover an alleged deficiency in the amount of royalty payments paid by the Defendant to the Plaintiff under a lease agreement between Plaintiff's and Defendant's predecessors in title.

The provisions of the lease, executed on May 13, 1944, which give rise to the dispute herein, are as follows:

"The royalties to be paid by Lessee are: . . . (b) on gas, including casinghead gas or other gaseous substance, produced from said land and sold or used off the premises or in the manufacture of gasoline or other products therefrom, the market value at the well of ⅛ of the gas so sold or used, provided that on gas sold at the well, the royalty shall be ⅛ of the amount realized from such sale."

The gas produced from the land subject to the lease agreement of 1944 (hereinafter the "Goodwin Lease") has been sold and delivered, and is presently being sold and delivered by the Defendant to the Transcontinental Gas Pipeline Corporation (hereinafter "Transcontinental") for transportation in interstate commerce pursuant to a contract made between the Defendant and Transcontinental in 1949, as amended in 1970. Since 1949 Defendant has paid to Plaintiff or her predecessors in title a royalty based on the amount realized from the sale of gas to Transcontinental. Plaintiff contends that the payments of royalty should be computed on the basis of the "market value" of the gas at the time of delivery to the interstate pipeline, rather than on the basis of the amounts realized from the sale of said gas.

I.

The Goodwin Lease provides for calculation of the royalty payment by one of two methods. If the gas is sold or used "off the premises", the computation shall be made on the basis of the market value of the gas at the time of the sale; if the gas is sold "at the wells", the royalty shall be computed on the basis of the amounts realized by the Lessee from the sale of gas.

The contract between Defendant and Transcontinental, executed on November 5, 1949, provides that delivery of gas under the contract shall be at a point "mutually agreed upon approximately three miles northwest of the town of George West, Live Oak County, Texas", or other point mutually agreed upon between Defendant and Transcontinental. (Plaintiff's Ex. 5, Art. VIII, Par. 24). This point of delivery was located off the premises approximately 3½ miles from the nearest line of the Goodwin Lease. (Defendant's Ex. H). Although there are gas meters and residue separator units at the mouth of each well on the lease premises, the central facility for the gathering of the gas is located off the premises, and the gas is metered for sale to Transcontinental after the gas

stream passes through the central facility. The Goodwin Lease clearly provides that the determination of the method of computation of royalty payments depends upon the point of delivery of gas to Transcontinental. Since the gas produced from the premises has been sold and is currently being sold off of the lease premises, payment of royalty to Plaintiff is not to be computed from the amounts realized from the sale of gas to Transcontinental, but is to be computed from the market value of the gas at the well, as provided in the lease.

## II.

The proper determination of market value involves an analysis of the lease provisions, the circumstances surrounding the execution of the contract of sale between the Defendant and Transcontinental, and the effect of the provisions of the Natural Gas Act, § 717 et seq., on the rights and obligations of the parties.

The most definitive treatment of the issue of determination of market value in a Texas oil and gas lease appears in the case of *Texas Oil and Gas Corporation v. Vela*, 429 S.W.2d 866 (Tex.Sup.1968). The lease in question contained the provision that the lessee was

> "To pay to lessor, as royalty for gas from each well where gas only is found, while the same is being sold or used off of the lease premises, one-eighth of market price at the well of the amount so sold or used."

If the lessee made other use of the gas, on the lease premises, it was bound to pay a royalty of ⅛ of the proceeds or ⅛ of the gas in kind to the lessor. Subsequent to the lease agreement the lessee entered into a contract for the life of the lease whereby it was to sell the gas produced at a price of 2.3 cents per thousand cubic feet. By 1964 the market price for natural gas was substantially in excess of 2.3 cents per thousand cubic feet. The lessee instituted proceedings to recover the market value of all gas produced. The Texas Supreme Court held that the lessee was bound to pay a royalty based on the prevailing market value at the

time of the sale of the gas to the pipeline. The Court further determined that the time of the sale was the time of delivery to the purchaser, not the time of execution of the contract for delivery of gas. Therefore, although the lessee was receiving only 2.3 cents per thousand cubic feet for the gas which it delivered to the pipeline company, the lessee was bound to pay to the lessor a royalty computed on the market value of the gas.

The Fifth Circuit Court of Appeals has also held that a lessee who has made a long term gas sale contract with knowledge of an obligation to the lessor to pay a royalty based on market value would be bound to honor that obligation, even though the lessee had failed to protect himself against increases in the market price. *Foster v. Atlantic Refining Company*, 329 F.2d 485 (5th Cir. 1954).

Defendant in the instant case finds itself in the same position as the lessees in *Vela* and *Foster*. The Defendant entered into a lease agreement whereby it was to pay the Plaintiff a royalty based upon the market value of the gas. A subsequent contract between the Defendant and a third party, the pipeline company, provided for a fixed price per thousand cubic feet and this price was to remain fixed for a period of twenty (20) years, subject to certain limited upward adjustments. The Defendant is presently faced with the dilemma of receiving a limited price for the sale of gas to Transcontinental, while being asked to pay a royalty computed on the basis of an ever increasing market value that Plaintiff alleges is greatly in excess of the price being received by the lessee.

Defendant distinguishes the language of the *Vela* and *Foster* leases from the language of the lease in the instant case. In the *Vela* lease, the royalty payments for gas were to be based on market value "while the same is being sold or used off of the [leased] premises"; the lease between the Plaintiff and Defendant in the instant case provides that the market value shall be paid for all gas "sold or used off the premises." Defendant argues that the absence of the

terms "while the same is being" indicates an understanding by the parties that a sale to a pipeline company is a completed sale upon the signing of the contract of sale, and that market value is to be computed at the time of that sale. The *Foster* lease provided that market price was to be computed where the gas was produced "when run". The lease provisions in the instant case do not contain the terms "when run". Therefore, argues Defendant, there is no continuing sale, as in *Foster,* but rather a one-time sale at the time of execution of the contracts between the Defendant lessee and the pipeline company.

The Court is not persuaded by Defendant's arguments distinguishing the *Vela* and *Foster* cases, as those rulings were not predicated on the particular language of the lease provisions being interpreted; rather, the *Vela* and *Foster* holdings were predicated on an earlier ruling that a contract for the sale of gas is an executory contract with an executed sale of gas being effected only at the time of delivery to the purchaser. *Martin v. Amis,* 288 S.W. 431, 433 (Tex.Com.App.1926). The distinction between the language of the lease provisions in the instant case on the one hand, and the leases in the *Vela* and *Foster* cases on the other hand is a distinction without a difference. The gas delivered to Transcontinental was not sold pursuant to the terms of the contract until actual delivery was made to Transcontinental.

Defendant points out that the United States Supreme Court has ruled that contracts for the sale of gas between a producer and an interstate pipeline company constitute "sales" under the Natural Gas Act. *Phillips Petroleum Company v. Wisconsin,* 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1946); *United Gas Improvement Co. v. Continental Oil Company,* 381 U.S. 392, 85 S.Ct. 1517, 14 L.Ed.2d 466 (1965). However, these rulings were merely determinations that such contracts were to be regulated by the Natural Gas Act, and were not determinations that a total, completed sale takes place upon the signing of the initial contract.

Therefore, the market value of the gas produced from the Goodwin Lease is to be determined as of the time the gas is delivered to Transcontinental, pursuant to the terms of the contract between Defendant and Transcontinental. The delivery of the gas is on a continuing basis and was not a completed sale of gas at the time of the initial contract in 1949.

### III.

■ Having determined that Defendant must pay a royalty computed on the "market value" at the time of delivery, as provided in the Goodwin Lease, the Court must next determine whether market value is limited by the amount which the Defendant received by virtue of the contract with Transcontinental. The contracts between Defendant and Transcontinental were executed under the authority of a Federal Power Commission Certificate of Public Convenience and Necessity authorizing the delivery to Transcontinental of the gas produced by the Defendant. The contract was regulated by the terms of the Natural Gas Act, 15 U.S.C. § 717 et seq. *Phillips Petroleum Company v. Wisconsin,* 374 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954). At the time of the execution of the contract, between Defendant and Transcontinental, the interstate market was the only available market for gas, and it was necessary for Defendant to dedicate its entire production to the interstate market in order to begin working the leased premises. The Federal Power Commission Rules and Regulations prescribe that once the gas is dedicated to the interstate market, the gas can not be diverted from that market, absent exceptional circumstances.

Defendant contends that the Plaintiff or her predecessors in title knew at the time of the lease in 1944 that the only available market for the gas which would be produced from the lease was the interstate market and that Plaintiff or her predecessors knew that the interstate price of gas would be regulated by the Federal Power Commission. Defendant concludes that Plaintiff is, therefore, bound to accept the price as reg-

ulated by the Federal Power Commission as the market value of the gas produced from the Goodwin Lease. A similar contention was raised by a lessee-producer, and rejected by the United States Court of Appeals for the Fifth Circuit, in *J. M. Huber Corporation v. Denman,* 367 F.2d 104 (5th Cir. 1966). In *Huber* the lessee-producer was advised by the lessors that, as a condition precedent to the execution of a lease, and as part of the consideration for said lease, the lessee-producer must have a positive contract with a pipeline company to take the production. In order to meet the condition precedent the lessee-producer entered into a contract with an interstate pipeline company before there was a lease or a binding agreement to obtain a lease. Several weeks after the lessee-producer signed the contract with the interstate pipeline company, the lessor and lessee executed a lease which would later supply the production to meet the terms of the contract between the lessee-producer and the pipeline company. The Court held that the demand that the lessee-producer have a firm commitment for the sale of gas, if and when produced, was not inconsistent with the expectation that the royalty paid to the lessor would be based on the current value of the gas being produced. The Court further found the terms of the pre-existing contract with the interstate pipeline company did not necessarily determine the "market value" to be paid for the gas produced pursuant to the lease agreement.

The difference in time of the execution of the respective leases distinguishes *Huber* from the instant case. The *Huber* lease was executed in 1936, before the effective date of the Natural Gas Act, while the lease in the instant case was executed in 1944, after the effective date of that act. Defendant asserts that the parties in the instant case, unlike the parties in *Huber,* contemplated that the royalty due to the lessor would be regulated by the Federal Power Commission, and that Plaintiff cannot now contend that she is entitled to a royalty based on an amount in excess of the rate allowed by the Federal Power Commission. However, although the Natural Gas Act became effective in 1938, the Federal Power Commission did not begin the practice of regulating contractual rates charged by producers selling gas to interstate pipelines until the Supreme Court's decision in *Phillips Petroleum Company v. Wisconsin,* 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954). *Phillips* held that the Natural Gas Act gave the Federal Power Commission authority to regulate those rates. *See also Huber, supra* at 119. Therefore, Defendant's argument that Plaintiff or her predecessors in title contemplated that royalty rates would be regulated by the Federal Power Commission is not compelling.

## IV.

The *Huber* court did not rule on the precise limits of the authority granted to the Federal Power Commission by the Natural Gas Act, but rather deferred to the Commission for delineation of those limits. *Huber* at 121. After the FPC ruled adversely to the lessors, the Court of Appeals for the District of Columbia Circuit held that the FPC jurisdiction over rates chargeable by a natural gas producer does not include the power to regulate the lessor-landowners and the royalty received from the lessee. *Mobil Oil Corporation v. Federal Power Commission,* 149 U.S.App.D.C. 310, 463 F.2d 256 (1972), cert. den., 406 U.S. 976, 92 S.Ct. 2409, 32 L.Ed.2d 676 (1973). Collection of royalties at a rate in excess of that established by the Federal Power Commission does not subvert the purpose of the Natural Gas Act nor undercut the Federal Regulatory System. *Id.*

## V.

Since April of 1951, the Defendant has made payments to the Plaintiff or her predecessors based on the amounts realized from the sale of gas to Transcontinental. In 1951 and 1952, Plaintiff's predecessors executed division orders declaring that the royalties to be paid by the Defendant would be based upon the "price and terms received by the Continental Oil Company in its sale to TRANSCONTINENTAL GAS PIPE-

LINE COMPANY under the terms of the gas sales contract which is dated November 5, 1949." Plaintiff's predecessors have accepted and Plaintiff is presently accepting payments based upon the amounts realized by Defendant from Defendant's contract with Transcontinental. Defendant contends that the execution of the division orders constitutes a ratification of the terms of the contract between Defendant and Transcontinental, and that acceptance of royalty payments based upon amounts realized now estops Plaintiff from asserting any entitlement to a royalty based on market value.

The division orders executed by Plaintiff's predecessors (Defendant's Exs. B, C, D, and E) ratified only the terms of the contract in existence on November 5, 1949. That contract, by its own terms, expired on April 1, 1971. (Pl. Ex. 5, Art. 9, Par. 25). On December 31, 1970, the Defendant and Transcontinental amended their contract, adjusting the prices to be received for the gas delivered to Continental, and extending the term of the contract through April 1, 1981. (Pl.Ex. 8). Subsequent to the amendment, neither Plaintiff nor her predecessors executed division orders purporting to ratify the the terms of the amended contract.

■ The mere receipt and acceptance by the lessors of less royalty than that to which they are entitled does not extinguish the debt owed the lessor by the lessee, and does not work an estoppel of a lessor's rights to later claim the full amount of royalty due to him. *Foster v. Atlantic Refining Company*, 329 F.2d 485 (5th Cir. 1964). Although Plaintiff may be barred by the terms of the division orders executed in 1951 and 1952, those division orders do not purport to ratify the terms of the contract between the Defendant and Transcontinental past the expiration date for that contract on April 1, 1971.

■ The parties in this cause have agreed, and the Court concludes, that the four year statute of limitations, Tex.Rev. Civ.Stat.Ann., Art. 5527, applies in this action. Recovery for deficiency in royalty payments between March 24, 1972 (four years prior to the institution of this lawsuit) and the present and recovery of a royalty based upon market value in the future is not precluded by a prior action of the Plaintiff or her predecessors.

## VI.

Plaintiff is, therefore, entitled to recover the difference between the market value of the gas produced from March 24, 1972 and the amount which has been paid to Plaintiff for the gas produced from March 24, 1972 to the present, and Plaintiff is further entitled to recover a royalty based upon the market value for all gas produced on the Goodwin Lease in the future.

## VII.

The market values for the relevant period at issue herein are set out in Finding of Fact No. 12 of the Findings of Fact and Conclusions of Law filed contemporaneously with this Opinion. Plaintiff is entitled to a recovery based on those market values. The market value of the gas produced from the Goodwin Lease has been established by the testimony of Plaintiff's expert witnesses. These witnesses testified as to amounts paid for gas delivered to other pipeline companies near the point of delivery of gas in the instant case and proximate in time to the delivery of the gas in the instant case. Plaintiff has demonstrated that markets are available for the gas produced from the Goodwin Lease, and that the gas from the Goodwin Lease could command a commensurate price were it not dedicated to the contract with Transcontinental.

## VIII.

IT IS ORDERED that Defendant submit to the Court, and to the Plaintiff, in writing, within twenty (20) days of this date a computation of the following information for the period between March 24, 1972 and the present date:

(1) The production from the wells on the Goodwin Lease,

(2) The rates paid to Plaintiff for the gas produced from the Goodwin Lease, and the total amount paid to Plaintiff pursuant to those rates,

(3) The difference between the rates paid to Plaintiff and the market value as set out in Finding of Fact No. 12, and the amounts owing to Plaintiff because of the differences in market value and the actual rates paid.

## IX.

It is further ORDERED that the parties submit to the Court in writing, within forty (40) days of this date, a proposed judgment for Plaintiff in accordance with this opinion.