**Patti Pavell DOMATTI**

v.

**EXXON CORPORATION.**

**Civ. A. No. 78–0526.**

United States District Court,
W. D. Louisiana,
Lake Charles Division.

July 29, 1980.

Jerry G. Jones, Jones, Jones & Alexander, Cameron, La., for plaintiff.

John Roper, Caillouet & Roper, H. H. Hillyer, Jr. and Kennedy J. Gilly, Jr., New Orleans, La., for defendant.

### OPINION

NAUMAN S. SCOTT, Chief Judge.

This market value controversy is before us on defendant's motion for summary judgment.

Patti Domatti, lessor, seeks from Exxon Corporation (Exxon), lessee, royalties which she claims are due under gas leases. The plaintiff contends that she is entitled to be paid royalty on the basis of the market value of the gas, but that she has been underpaid because she has been paid only on the basis of the price received by Exxon in the sale of the gas to an interstate pipeline company, Tennessee Gas Pipeline Company (Tennessee).

The pertinent facts are not in dispute. Plaintiff granted a lease in 1964 in which the lessee agreed to pay as royalty

"one-eighth (⅛th) of the market value of the gas sold or used by Lessee in operations not connected with the land leased or any pooled unit containing a portion of said land; . . .".

In 1970 another lease was executed covering other lands belonging to the plaintiff and plaintiff was to receive as royalty

"on gas, including casinghead gas or other gaseous substances and the liquid hydrocarbon content thereof, produced from said land and sold or used in operations not connected with the land leased or any pooled unit containing all or part of said land, or for the manufacture or extraction gasoline or other products therefrom, one-half (½) of the market value at the mouth of the well of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-half (½) of the amount realized from such sale, and provided further that in computing such value there shall be excluded all gas or components thereof used in lease or unit operations or injected into any subsurface stratum or strata, as hereinafter provided; . . .".

Portions of these lands have been included in two Louisiana Conservation Commissioner units, Christmas SUA and Christmas SUB, in the Deep Bayou Field (Field). The well for SUA was completed and shut in in January of 1967; the well for SUB was completed and shut in in February of 1968. The wells were shut in for lack of market. There are no other producing wells in the field.

In November 1968, Exxon entered into a contract with Tennessee, a company wholly independent of Exxon, for the sale of the gas produced from these wells. The price was negotiated and was made subject to escalation to the maximum area rate which might be allowed by the Federal Power Commission (FPC). A certificate of public convenience and necessity from the FPC was obtained. The gas was and is purchased by Tennessee for resale in interstate commerce. Tennessee is the only purchaser of gas produced in the field; furthermore,

all gas sold is subject to the 1968 contract. The royalties that have been paid have been based upon the price received by defendant under its contract with Tennessee. The price received is the highest allowed by the Federal Energy Regulatory Commission (FERC), formerly the FPC.

Plaintiff's case is based upon the contention that rates determined by the FERC for interstate gas are "foreign, irrelevant and immaterial" to a determination of the market value of the gas and that reference to the value of unregulated intrastate gas is required.

## I. EXXON'S MOTION

In its motion for summary judgment, Exxon asserts that the market value of the plaintiff's gas is the regulated price received under the Tennessee contract.

In 1954, the Supreme Court held that a natural gas producer was a natural gas company within the meaning of the Natural Gas Act,[1] and therefore the prices that it received from the sale of gas destined for interstate commerce were subject to FPC regulation. *Phillips Petroleum Co. v. Wisconsin*, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954).

The Court of Appeals for the District of Columbia held that a royalty owner (such as the plaintiff here) was *not* a natural gas company under the Act; therefore, the royalties received by him were *not* subject to FPC regulation. *Mobil Oil Corp. v. FPC*, 463 F.2d 256 (D.C.1972). The court recognized that the construction of a royalty provision, and therefore the amount of royalties due under a lease, was to be determined by reference to state law. In a dictum, the court said:

"Without purporting to rule on the matter in any way, we can certainly visualize the possibility that a court confronted with a contention of entitlement to a market price basis higher than the producer's ceiling would consider it to run counter to the intention of the parties, unless there is something to rebut the

---

**1.** 15 U.S.C. §§ 717 *et seq.*

*fair presumption that they contemplated interstate movement and market prices compatible therewith."* 463 F.2d at 265. (emphasis ours).

It is Exxon's contention that the fair presumption spoken of in *Mobil Oil* is present. Exxon points out that *Phillips I*[2] was decided years before the leases involved here were executed. Exxon maintains that when plaintiff executed division orders in 1968, 1970, and 1971 and was paid royalty on the basis contained therein, the fair presumption was established. Each of the division orders contains the following provision:

> "Settlements for gas sold at wells or at a central point in or near the field where produced shall be based on the net proceeds at the wells. . . . Where gas is sold subject to regulation by the Federal Power Commission or other governmental authority, the price applicable to such sale as approved by order of such authority shall be used as a basis for determining the net proceeds at the wells or the net value at the wells."

Exxon buttresses its argument by pointing out that the Supreme Court, in a different, though not unrelated context, has recently recognized lessor acquiescence in interstate gas sales. In *California v. Southland Royalty Co.*, 436 U.S. 519, 98 S.Ct. 1955, 56 L.Ed.2d 505 (1978), the court held that a lessor whose gas had been dedicated to interstate commerce could not divert the gas to the intrastate market after the expiration of the lease without FERC authorization under Section 7(b) of the Natural Gas Act, 15 U.S.C. § 717f(b). The lessors argued that they had not dedicated the gas to interstate commerce nor had they acquiesced in the lessee's dedication of the gas, but the court nevertheless said:

> "In any event, we perceive no unfairness in holding respondents, as lessors, responsible for continuation of the service until abandonment is obtained. Respondents were 'mineral lease owners who entered into a lease that permitted the lease holders to make interstate sales.' . . .

They did not object when Gulf sought a certificate from the Commission. Indeed, as the Commission pointed out, Gulf may even have been under a duty to seek interstate purchasers for the gas. . . Gas leases are typically construed to include a duty diligently to develop and market, . . . and at the time the certificate was sought the interstate market was the major outlet for gas . . . . Having authorized Gulf to make interstate sales of gas, respondents could not have expected those sales to be free from the rules and restrictions that from time to time would cover the interstate market." 436 U.S. at 529, 98 S.Ct. at 1960, 56 L.Ed.2d at 513. (Citations omitted).

Exxon places considerable emphasis on three diversity cases from Texas, *Weymouth v. Colorado Interstate Gas Co.*, 367 F.2d 84 (5th Cir. 1966), *Hemus & Co. v. Hawkins*, 452 F.Supp. 861 (S.D.Tex.1978), and *Brent v. Natural Gas Pipeline Co. of America*, 457 F.Supp. 155 (N.D.Tex.1978).

*Weymouth*, the basis for the court's decisions in *Hemus* and *Brent*, noted the different definition of the willing-buyer/willing-seller test for market value of regulated gas:

> "The law must take account of the fallout of *Phillips I*. That means that while the inquiry might be: what would a willing seller and buyer pay?, the circumstances of that fictional negotiation must reckon with the nature of this business. It is in no sense a 'free' market. The usual 'free, willing' negotiators contemplate a contract binding on each and enforceable as the bargain made. But this is only partially true for gas sales, [for resale in interstate commerce]. . . ." 367 F.2d at 89. (footnotes omitted).

The court then defined the market value of jurisdictional gas.

> "So this 'free', 'willing' buyer is not so 'free'. Nor is his counterpart, the seller. Nor is the commodity. Nor is the business. Nor is the sale. The test in capsulated form is then, what would a willing

---

**2.** *Phillips Petroleum . Co. v. Wisconsin, supra.*

seller and a willing buyer in a business which subjects them and the commodity to restriction and regulation, including a commitment for a long period of time, agree to take and pay with a reasonable expectation that the FPC would approve the price (and price changes) and other terms and then issue the necessary certificate of public convenience and necessity." 367 F.2d at 90.

The *Hemus* and *Brent* decisions are virtually identical. Plaintiff sought royalty for interstate gas under market value clauses; defendants urged that the rates upon which they based payment, the FPC rates, were the market value. After trial, the courts weighed the testimony of the experts and determined that the lessee's expert (the same man in each case) was the only one whose testimony met the test of *Weymouth*. Basically, the witness determined that there were two markets, one interstate and one intrastate,[3] and that since the gas in question was "irrevocably, completely and permanently dedicated to interstate commerce, the only relevant market for the purpose of valuing [interstate gas] is the interstate market." 452 F.Supp. at 862. Both courts held that as a matter of law intrastate sales of gas are not comparables for determining the market value of regulated gas.

## II. PLAINTIFF'S OPPOSITION

Domatti insists that summary judgment is improper, and she presents a number of different reasons why she thinks defendant's motion should be denied.

### A. RECONSTRUCTION UNDER TYSON.

·Plaintiff insists that under the decision of *Tyson v. Surf Oil Co.*, 195 La. 248, 196 So. 336 (1940), she is entitled to "reconstruct" the value of the gas by reference to the

value of other gas and to make adjustments for the location, quantity and quality of the plaintiff's gas. She argues that since she did not consent to the dedication of the gas to interstate commerce, as was the case with the plaintiff in *Tyson*, the reconstruction method is proper. We think that the facts of *Tyson* are sufficiently distinguishable here to preclude reconstruction per *Tyson*. In that case, the court said:

"The evidence as produced shows that C. M. Leonard was the moving spirit of all three of defendant affiliated companies, and that he fixed the price of gas at which La-Tex Crude Oil Purchasing and Pipeline Company would pay for it. We hold therefore that, insofar as the sale price of the gas to the Shoreline Oil Company at one cent per thousand cubic feet was without the consent of the plaintiffs, the price is not binding on plaintiffs and they are entitled to recover a fair market value for the gas at the well where produced." 196 So. at 339.

### B. SARTOR, WALL.

In addition to *Tyson*, plaintiff apparently relies upon a number of other cases which arose in Louisiana.[4] We do not understand plaintiff's reliance upon these cases as they seem to lend more support to the defendant's position than to the plaintiff's.

Basically these cases announced that the market price of gas is determined by reference to the price at the well or, if there is no price at the well, in the field, less costs. As the Fifth Circuit said in *Haynes v. Southwest Natural Gas Co.*, 123 F.2d 1011 (1941):

"In long drawn out controversies, arising in Louisiana, we have had recent occasion to canvass and determine, the meaning and effect of a market value clause in a gas lease, the requirements of proof with respect thereto, and the rights of parties

---

3. In *Hemus*, there were actually two markets at the *well* in question. Defendant's gas was dedicated to the interstate market; two other lessors sold their gas in the intrastate market.

4. *Wall v. United Gas Public Service Co.*, 178 La. 908, 152 So. 561 (1934); *Sartor v. United Carbon Co.*, 183 La. 287, 163 So. 103 (1935);

*Sartor v. United Gas Public Service Co.*, 186 La. 555, 173 So. 103 (1937); *Arkansas Natural Gas Co. v. Sartor*, 78 F.2d 924 (5th Cir. 1935), *cert. denied* 296 U.S. 656, 56 S.Ct. 381, 80 L.Ed. 467 (1936); and *Sartor v. United Gas Public Service Co.*, 84 F.2d 436 (5th Cir. 1936).

thereunder. We have there made it clear, that such a clause makes the value at the well controlling, that it is only where the proof shows there is no market value at the well that prices obtained in the vicinity thereof, can be resorted to, and that this resort is only for the purpose of the light they throw on market value at the well, and not for the purposes of obtaining those prices." 123 F.2d at 1012.

Plaintiff's insistence that the affidavit filed in opposition to defendant's motion shows that there is evidence to utilize this method of computation is misplaced for several reasons.

First, the affidavit indicates that in the Johnson Bayou area (which includes the Deep Bayou Field) there are a number of interstate and intrastate sales and that the market price for gas has exceeded $1.40 per MCF in the area. We do not understand how this disputes the fact established by the defendant that the sale of gas in question is the only sale of gas from the Deep Bayou Field. If these cases cited by plaintiff are correct, sales outside of the field should not be comparable.

More importantly, we do not think that these old cases address the issues presented in this case. For one thing, all of these cases are pre-*Phillips I.* There was no such thing as regulated, interstate gas at the time these cases were decided. Secondly, these cases were decided at a time when gas was often considered as a waste product, before the extensive use of pipelines for gas transmission.[5] Thus, the practical nature of the gas business compels the conclusion that we need not be automatically bound by these cases. In the *Weymouth* case, the court pointed out some of the problems with these cases:

"Of these cases we have several comments. First, we find much basis for Judge McCord's dissenting remarks:

'I do not contend that decisions in these cases [Sartor] are wrong. I desire only

to point out that our opinions as to the evidence necessary to disclose fair market value, which is the important and controlling issue in nearly everyone of these cases, seem to have been confusing and misleading.'

"*Phillips Petroleum Co. v. Bynum*, 5 Cir., 1946, 155 F.2d 196, 200 (dissenting opinion). Next, with *Phillips I* and its wake so much gas has flowed through the jurisdictional pipelines that there is little resemblance today to the free-wheeling operations of those unregulated times. . . .'". 367 F.2d at 91, f. 26.

We are of the opinion that these cases simply do not aid the plaintiff's case.

## C. HUBER AND WEYMOUTH.

Plaintiff also relies upon *J. M. Huber v. Denman*, 367 F.2d 104 (5th Cir. 1966). Plaintiff reads *Huber* as holding that "a market value lease on its face calls for payment of a price based upon the theoretical free market."

In that case, the lessee-producer argued that the parties *intended*, based upon the past actions of both, to limit the market, from which would be determined the market value, to the prices received under the contract with the pipeline. The trial court found as a fact that this was not what was intended; the Fifth Circuit affirmed this finding and made the following statement, which is relied on here by the plaintiff:

"We do not minimize the beguiling appeal of the Lessee-Producer's theory. Without a doubt, with the Lessors' full approval, this committed until the exhaustion of the reserves all of the gas to this contract and hence to this 'market.' But the 'market' as the descriptive of the buyer or the outlet for the sale is not synonomous with its larger meaning in fixing price or value. For in that situation the law looks not to the particular transaction but the theoretical one between the supposed free seller *vis-a-vis* the contemporary free buyer dealing

---

**5.** Comments, *Vela*: Legacy of Conflict Over Determination of Market Value for Royalties on Intrastate and Interstate Gas and Continued

Controversy with the Natural Gas Policy Act of 1978, 11 St. Mary's Law Journal 502 at 503 (1979).

freely at arm's length supposedly in relation to property which neither will ever own, buy or sell. It was not, as this theory would make it read, an agreement to pay ¼th of the price received from the market on which this gas is sold. Rather, it was to pay ¼th of the 'market price' or 'market value' as the case might be." 367 F.2d at 109–110.

In making that statement, the court dropped a footnote to point out the not-so-free buyers, commodity, or market with respect to regulated gas, citing *Weymouth, supra*, which was decided on the same day by the same panel and announced by the same judge as *Huber*.

Plaintiff attempts to distinguish *Weymouth* and the test announced therein from *Huber*, but we do not believe that the cases announce different rules that require distinction. Though perhaps the cases are not entirely clear, it seems to us that what *Huber* says is that the parties in that case intended market value to mean value of the gas on the market; *Weymouth* simply defines what that market is.

## D. THE FPC AND THE COURTS.

Plaintiff points to several federal court decisions relating to FPC (FERC) jurisdiction. In both *Weymouth* and *Huber*, the Fifth Circuit referred to the FPC the initial question of whether the FPC had jurisdiction over royalty payments. In *Mobil Oil Corp. v. FPC*, 463 F.2d 256 (D.C.1972), *cert. denied*, 406 U.S. 976, 92 S.Ct. 2409, 2410, 2413, 32 L.Ed.2d 676, the court determined that the FPC did not have jurisdiction over royalty payments. In *Placid Oil Co. v. FPC*, 483 F.2d 880 (5th Cir. 1973), the court had before it for review FPC orders setting forth area rates for gas at the wellhead in the South Louisiana Area. One of the producers urged that it was erroneous for the FPC—in light of *Mobil Oil Corp., supra* —not "to take account of the possibility that royalty obligations might require a greater portion of the new rate than FPC thought." 483 F.2d at 911. Pointing out the correctness of the producer's argument as to the law, the court refused to set aside the area wide rates based on what might

happen, stating that individual relief could be sought if the need arose. The Supreme Court affirmed. 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974). Thus as the law stood at that point, the FPC had no jurisdiction to fix royalty payments; however, if a lessee was placed in an adverse economic situation because of an obligation to pay higher royalty, individual relief could be sought from the FPC as to the rate. Subsequently the Supreme Court, in *FERC v. Pennzoil Producing Co.*, 439 U.S. 508, 99 S.Ct. 765, 58 L.Ed.2d 773 (1979), determined that the FERC had the power to increase rates to relieve a producer who becomes obligated to pay royalties based upon a non-regulated intrastate market and to allow him to pass the increase on.

Plaintiff contends that these cases, particularly *Pennzoil*, are authority for denying the defendant summary judgment. Plaintiff's argument is as follows:

"Exxon contends that the FERC area rate *is* the market value of the gas because we are dealing with *regulated* gas and only *regulated* comparables are relevant in determining market value. If Exxon's position is accepted, then *Pennzoil* must be ignored. Why would the court have been concerned with the 'pass on' of a higher market price above the FERC rate if the law says that the FERC area rate is the market value?" (Page 11 of Plaintiff's Brief).

Plaintiff's argument is not tenable for two reasons. First, in *Pennzoil*, there had been a settlement of a market value lease dispute among the lessor, the lessee and the pipeline so that the lessor would be paid royalties based upon unregulated intrastate gas, if certain relief could be obtained from the FERC. The Pennzoil suit was over the question of the FERC's granting of the relief. Thus, plaintiff's contention that the court would not have been concerned with "pass on" if the FERC area rate was the market value, is not tenable since there was no holding of law in the case as to what market value was; that matter was compromised. The only issue for decision was the FERC's power. Secondly, just because

the FERC has power to grant relief based upon market value leases does not mean as a matter of law that in every case market value is not to be determined by reference to interstate-regulated gas or that in every case market value .is more than the price received for regulated gas. All that the courts have been saying is that there is a distinction, theoretically, between FERC rates and market value; the elements constituting each are different. The cases hold that the FERC has no authority to fix royalty payments based upon market value; they do not hold that FERC rates are irrelevant in establishing market value.

### E. VELA, LIGHTCAP & KINGERY.

Plaintiff principally relies upon three cases in support of her position, *Texas Oil & Gas Corporation v. Vela*, 429 S.W.2d 866 (Tex.1968), *Lightcap v. Mobil Oil Corp.*, 221 Kan. 448, 562 P.2d 1 (1977), and *Kingery v. Continental Oil Co.*, 434 F.Supp. 349 (W.D. Tex.1977). We find none of these cases to be persuasive.

In *Vela*, the issue before the court was the royalty obligation of a lessee who agreed to

> "pay to lessor, as royalty for gas from each well where gas only is found, while the same is being sold or used off of the premises, one-eighth of the market price at the wells of the amount so sold or used." 429 S.W.2d at 868.

After reviewing the facts, the Supreme Court of Texas stated the following:

> "It is clear then that the parties knew how to and did provide for royalties payable in kind, based upon market price or market value, and based upon the proceeds derived by the lessee from the sale of gas. They might have agreed that the royalty on gas produced from a gas well would be a fractional part of the amount realized by the lessee from its sale. Instead of doing so, however, they stipulated in plain terms that the lessee would pay one-eighth of the market price at the well of all gas sold or used off the premis-

es. This clearly means the prevailing market price at the time of the sale or use. The gas which was marketed under the long-term contracts in this case was not "being sold" at the time the contracts were made but at the time of the delivery to the purchaser. . . . We agree with the Court of Civil Appeals, therefore, that the contract price for which the gas was sold by the lessee is not necessarily the market price within the meaning of the lease. . . ." (Citations omitted) 429 S.W.2d at 871.

This language is relied upon by the plaintiff in opposition to the defendant's motion.

Justice Hamilton, speaking for three other dissenters, wrote:

> "I cannot agree with the Court's holding that the 'market price' mentioned in the royalty clause must be determined as of the date of delivery of the gas. While I agree with the Court's holding that the price in the gas sales contracts is not *necessarily* controlling, it could very well be, depending on the circumstances under which the contract price was determined." (Emphasis theirs) 429 S.W.2d at 878.

The dissenters looked to the practices of the gas business at the time that the gas sales contract was made and concluded that the parties intended market value to mean the price prevailing on a long-term contract as of the time that the contract was made. More importantly, the dissent recognized that *Foster v. Atlantic Refining Co.*, 329 F.2d 485 (5th Cir. 1964), the case relied upon by the majority for the proposition that one must look to the market value at the time of delivery of the gas, involved an unusual royalty clause and should not have been relied upon.[6]

We disagree with *Vela* for another reason. The case simply does not address the problem of how the market value of interstate gas is to be determined.

---

**6.** *Foster* involved a clause which obligated the lessee to pay royalty on gas based upon the "market price therefor prevailing for the field where produced *when run* . . .". 329 F.2d at 488. (Emphasis ours).

*Vela* is not however without some merit. The court did recognize that it is necessary in determining market value to examine "sales of gas comparable in time, quality and availability to marketing outlets," 429 S.W.2d at 872, citing *Phillips Petroleum Co. v. Bynum*, 155 F.2d 196 (5th Cir. 1946).

*Lightcap* held that the market value of interstate gas is to be determined by utilizing intrastate and interstate gas sales as comparables. In other words, the market value of regulated gas was to be determined by reference to the hypothetical free market without reference to government regulation.

We reject the reasoning of the majority opinion in *Lightcap*, as we find it unpersuasive. As Justice Fromme in dissent, joined by two others, pointed out:

"The majority opinion completely disregards the question of what evidence may be necessary to establish a 'market price'." 562 P.2d at 30.

*Kingery* is also cited by the plaintiff. In that case, the court, relying on *Vela* and *Foster*, determined that the gas was being sold at the time of delivery and not at the time the gas sales contract was made. Having made that determination, the court then addressed the problem of what effect, if any, FPC regulation had on market value; the court concluded that there was none and that reference must be had to unregulated sales to determine the value of the gas. We are not persuaded by *Kingery*.

The plaintiff's position ignores one of the basic realities of the gas business. A mineral lessee "is bound to perform the contract in good faith and to develop and operate the property leased as a reasonably prudent operator . . .". Louisiana Mineral Code, art. 122. This prudent operator standard includes the duty to "exercise reasonable diligence to secure a market for minerals that have been produced . .". See, Comment to MC art. 122, *supra*.

The physical nature of gas makes it impossible to market gas without the construction of pipelines. It is not possible to store gas in tanks for transfer to market as is the case with oil. So a pipeline purchaser must have assurance that his investment in constructing a pipeline will pay off; his assurance—a long-term gas sales contract. See, Kelly, *What Price, Gas ?*, 7 St. Mary's Law Journal 333 (1975); Morris, *The Gas Royalty Clause—What is Market Value ?*, SW Legal Foundation, 25th Institute on Oil and Gas Law and Tax 63 (1974); Ashabranner, *The Oil and Gas Lease Royalty Clause—One-Eighth of What ?*, 20 Rocky Mountain Mineral Law Institute 163 (1975). These factors are present whether the gas is unregulated or is dedicated to interstate commerce.

Coupled with these problems, there is also the reality that intrastate gas is unregulated as to price, while interstate gas is regulated. Since the energy crisis began, principally after the 1973 embargo, there has developed an enormous price disparity between interstate and intrastate gas. This lower priced, regulated gas cannot be diverted to the more lucrative intrastate market without FERC authorization.

The question presented to us in this motion for summary judgment is whether or not intrastate sales are comparables for determining market value of regulated gas. In an earlier ruling, we denied plaintiff the right to discover evidence as to the defendant's intrastate sales, being of the opinion that intrastate sales were not comparables.

In *Phillips Petroleum Co. v. Bynum, supra*, the Fifth Circuit though not faced with the question of whether intrastate sales were comparables to determine the market value of interstate gas, required that determinations of market value be made by reference to *comparable sales*. The court recognized that sales of gas to interstate pipeline companies for fuel and heating purposes were not comparables to determine the value of gas sold to purchasers for gasoline extraction purposes only. The court recognized that under the evidence presented in that case

"The only substantial market for the plaintiffs' gas is that afforded by plants that extract gasoline and other products from the gas, and in the absence of proof

of an unlawful combination between such producers for suppression of the market price, the test is what do such producers pay for gas similar in quantity, quality and availability to market?" 155 F.2d at 199. See *Vela, supra.*

Comparability is the key, and as we have already pointed out, intrastate sales (the only sales relied upon by the plaintiff in opposition to defendant's motion) are not comparables. Judge Woodward in *Brent* made the following comments, which are applicable here:

"This court concludes, considering FPC regulation of interstate gas, that under the facts of the instant case only sales of interstate gas are comparable to determine the 'market value' of the gas in question, and that sales of intrastate gas are not comparable to make such a determination. *Hemus & Company, et al. v. Hawkins, et al.,* 452 F.Supp. 861 (S.D. Tex., decided June 20, 1978). There are two markets for gas, intrastate and interstate, but the only market for the gas in question in the instant case is the interstate market.

\* \* \* \* \* \*

"In conclusion the court finds that there are two distinct markets for gas in the geographical area where defendant's wells are located, the interstate market and the intrastate market. The gas in this case has been irrevocably dedicated to the former. Therefore, only interstate gas sales in the relevant geographical area, made by producers of the same classification as defendant and involving gas of the same vintage as the gas in question, are comparable to determine the 'market value' of the gas involved in this case." 457 F.Supp. at 160 and 162–163.

See also, Comments, *Vela, supra,* note 5.

We do not hold that the price received under the Tennessee contract is the market value of the gas because it was the price received; we hold that the price received is the market value because it is the only price that reflects the market value of plaintiff's interstate gas. No other comparable evidence has been submitted.

So, following the reasoning of the courts in *Brent* and *Hemus,* we hold that intrastate sales are not comparables for determining the market value of the plaintiff's gas. Defendant's motion for summary judgment is granted.

Counsel should submit a form of judgment consistent herewith within twenty days.