No. 46,634

E. Verne Lippert, *et al., Appellees,* v. George A. Angle, *Appellant.*

(508 P. 2d 920)

Opinion filed April 7, 1973.

*Gerald Sawatzky,* of Foulston, Siefkin, Powers and Eberhardt, of Wichita, argued the cause, and *John J. Stang,* of La Crosse, was with him on the briefs for the appellant.

*Robert J. O'Connor,* of Wichita, argued the cause, and *Richard Jones,* of Wichita, was with him on the brief for the appellees.

The opinion of the court was delivered by

HARMAN, C.: This is an action by lessors seeking to recover royalties for gas produced from gas wells and for interest thereon. The trial court rendered judgment for plaintiff lessors, ordering payment of the royalties sought, plus interest. The defendant lessee appeals, contesting the amount of royalties due and the liability for interest.

The material facts are not in dispute. We summarize those essential for an understanding of the litigation. Appellant George

A. Angle, who commenced his business career as a geologist, has been in the oil and gas industry on his own as a driller and producer since 1953. In the early 1960's he began securing oil and gas leases in the Reichel gas field primarily in Rush county. Gas wells in this area had previously been connected to the Kansas-Nebraska Company pipeline gathering system and gas was sold to Kansas-Nebraska and then processed for helium extraction in a small United States government helium plant at Otis. This plant operated from 1945 to 1968.

Included among the leases which appellant acquired in the Reichel field were leases from appellees, the Lipperts and others, for whom appellee E. Verne Lippert, one of the largest owners, was spokesman and witness. The leases in question were standard form 88 (Producers 1952) covering oil and gas. The royalty clause for gas sold from the leased premises provided for monthly payment in the amount of one-eighth of its market value at the well.

Appellant's ultimate hope in his leasing program was to develop helium-bearing gas reserves in sufficient quantities to support a liquid helium extraction plant. By securing leases and drilling wells he eventually developed what he considered sufficient helium reserves to warrant the construction of his own gathering system and the helium plant. Appellant had about 35,000 acres under lease. For a period of time after development he paid shut-in royalty on some of the wells, including those of appellees.

Because he had witnessed what he considered breaches of confidence by persons connected with the highly competitive oil and gas industry appellant had developed a policy of not revealing his plans to anyone more than was required and during the time he was obtaining these leases he did not reveal to the lessors his plan for eventually establishing a liquid helium extraction plant.

On July 25, 1963, appellant contracted with Air Reduction Company, a large purchaser and marketer of helium, for the sale of liquid helium he hoped to produce. With this contract and the various leases he had secured appellant was able to obtain from New York banks financing in the amount of $7,000,000 with which to build his helium plant and make other necessary expenditures in connection with the project.

In order to assure Air Reduction and his bankers as well that he had unquestioned ownership in the gas from which he expected to produce helium, appellant asked his royalty owners to sign an

instrument prepared by him entitled "Division Order and Gas Purchase Agreement" (referred to hereafter as DOGPA). This document provided for royalty payments on all gas of 14¢ per m.c.f., less proportionate reductions for gas containing less than a certain amount of BTU's. The instrument contained no reduction for any compression charges. It specifically covered "all of the gas in its natural state, together with all its liquid and gaseous components including hydrocarbons and non-hydrocarbons produced from and attributable to Second Party's interest in the production of said substances from wells now or hereafter drilled. . . ." At that particular time and previously there had been discussion by lessors in some gas fields which contained helium that the ordinary oil and gas lease did not include transfer of the rights to the helium, a non-hydrocarbon, and some landowner suits had been filed claiming title to the helium produced but none had been finally determined. The DOGPA also gave appellant the right to produce and sell *all* the gas produced without any reservation of use by lessors of gas for household purposes on dwellings located on the leased premises. The DOGPA was for a period of twenty years and as long thereafter as gas was produced.

At the time the DOGPA was submitted to the lessors the highest price paid for gas in the Reichel field was 13¢ per m.c.f. (less certain reductions for below-standard BTU content and for compression charges where applicable). This price was being paid by Kansas-Nebraska for gas which was processed through the government helium extraction plant and then sold by Kansas-Nebraska for heat, fuel and light. Other prices in the field were lower than that, including one of 10¢ per m.c.f. paid by Kansas-Nebraska for a recently connected well.

More than 340 of appellant's royalty owners in the Reichel field executed the DOGPA but appellees refused to do so. Appellees had heard rumors of a new helium plant and their refusal, in part at least, was because they thought the 14¢ price basis was less than they would receive under the provisions of the lease. Appellant completed his gathering system and liquid helium plant and commenced production. He produced gas at approximately ninety-six wells and transported it to his plant at Otis where helium was extracted in liquid form. Appellant then sold the helium and the residue natural gas to third parties. Appellant's helium plant commenced operation in 1966. Since appellees had not signed the DOGPA appellant withheld their royalty payments, sending them

each month instead a statement entitled "Payment Advice", which indicated the amount of royalties they would receive under the DOGPA. This document also stated the running total of royalties which were "being held in suspension and cannot be paid to you until our office receives your signed division order". Appellant made no other offer or tender of royalties to appellees, except as hereinafter stated.

On February 1, 1967, Kansas-Nebraska increased its purchase price in the Reichel field to 14¢ per m.c.f., less reductions, apparently in accord with a general industry custom that the price be increased 1¢ every five years.

On October 27, 1969, appellees brought this action in the form of an accounting to recover their royalties. Initially they claimed royalties in excess of the 14¢ per m.c.f. mentioned in the DOGPA. Their petition alleged that no market value existed for the gas and they requested royalties based on its actual, intrinsic or real value. They also sought interest at the rate of ten percent per annum.

Appellant answered. He denied the allegation that no market value for the gas existed and he asserted no interest was owing. He acknowledged he was holding in suspension the royalties due appellees and others who had not signed the division order providing for payment of royalties.

Appellees then filed a motion for partial summary judgment in which they sought payment of the 14¢ per m.c.f. provided in the DOGPA as a credit against appellant's royalty obligation, plus interest thereon, without prejudice to their claim for additional amounts as royalties. Appellant responded to this motion by filing an affidavit stating that the DOGPA was intended to assure that royalty payments were made to the right parties, to prevent controversy and litigation and to arrive at an agreement as the basis for royalty payment; he maintained the actual market value at the well was less than 14¢ per m.c.f. and cited instances of sales supporting this conclusion.

The trial court sustained appellees' motion but later, upon appellant's application, set it aside "for the reason that the claim of the plaintiffs is unliquidated". Meanwhile, and on April 23, 1971, appellant moved for summary judgment on the ground that no genuine issue of material fact existed as to whether there was a market value for gas nor as to the amount of such market value. At the same time appellant made a tender to appellees of royalties computed on the basis of a market value of 13¢ per m.c.f., less re-

ductions, for all gas produced up to February 1, 1967, and on the basis of market value of 14¢ per m.c.f., less the same reductions, for gas produced after February 1, 1967.

The trial court denied appellant's motion for summary judgment. A pretrial order was entered defining as issues for trial, whether or not a market value for the gas was ascertainable, and if so, the amount of that value. If market value was found not to exist the amount of royalties due appellees was reserved for future determination.

In assembling evidence for trial and in response to requests and interrogatories, appellant prepared exhibits to show, among other things, market value as well as other material tending to show that intrinsic value of the gas would be less than market value. After reviewing this evidence prior to trial appellees withdrew their contention that no market value for the gas existed. As a consequence, the issues initially agreed upon at pretrial were stricken and the case proceeded to trial upon two issues: Ascertainment of the market value of the gas, and the propriety of interest on the royalties due.

In trial commencing June 14, 1971, the court then heard evidence and thereafter, on October 20, 1971, filed a lengthy journal entry discussing the case and embodying its findings and conclusions. For present purposes we need recite only the following findings:

"19. From the evidence this Court finds that the actual market value at the wellhead in the Reichel field was 13¢ per m.c.f., less proportionate reduction for BTU content below 950 per cu. ft. from date of first production in 1965 to February 1, 1967, less 1½ per m.c.f. as cost of compression supplied by defendant, and from February 1, 1967, to the present, was 14¢ per m.c.f., less the same reductions. (Testimony of Ford, Beardsley). Defendant's payment of royalty based on 14¢ per m.c.f., less reduction for BTU content below 950 per cu. ft., to other royalty owners did establish for the plaintiffs that 14¢ as the market value. Although the defendant Angle was paying what he considered a premium in return for the amendatory agreement providing a permanent basis of royalty settlement, and insuring that payment would be for all gas including hydrocarbons and non-hydrocarbons, he never disclosed this fact to any of the plaintiff lessors. The differences that the plaintiffs on one hand as royalty owners and the defendant Angle, as a purchaser and user of their gas, arose out of a lack of communication. Angle only wanted to tell a part of the story, and his attitude and his monthly insistence that the royalty money would be

"'held in suspension and cannot be paid to you until our office receives your signed division order.'

without an explanation or an attempt to negotiate and disclose pertinent facts brought about, in part, the refusal of the defendant's landowners to execute

Angle's DOGPA. This in turn gave Angle the right to use the money held in suspense as he saw fit, inuring to his benefit. The defendant Angle was in effect saying, 'If you don't agree with me, I'll keep and use the money myself until you do, and I have no intention to assist or help or show you my determination of value is correct.'

"20. Because of a lack of knowledge, and until June 14, 1971, plaintiffs claimed there was no market value at the well for gas from their lands, and sought recovery on a 'proceeds less expenses' basis to arrive at a 'reasonable or intrinsic' value. However, defendant under order of this Court supplied information to the plaintiffs shortly before trial, which as a result, plaintiffs changed their position on June 14, 1971, and asserted that market value was a proper measure of defendant's royalty obligation, and that such a market value existed at all times. Plaintiffs' claim that the market value of 14¢ per m.c.f. is admitted by defendant to be that price. The plaintiffs seek recovery of royalty on that basis, plus interest, saying that it was only the lack of knowledge (that the defendant Angle had exclusively in his possession) which caused any disagreement as to whether the market value or the reasonable or intrinsic value was proper in this case.

"21. The defendant owes royalty to plaintiffs, through April 1971, in the total principal amount of Forty-Eight Thousand Two Hundred Ninety Dollars and Fifty-Two Cents ($48,290.52).

"22. That defendant owes interest to plaintiffs on said royalty, at the rate of six percent (6%) per annum to July 1, 1967, and at eight percent (8%) per annum thereafter (K. S. A. 16-201 and 16-204), commencing on the date the various accumulated royalties became due and payable under the terms of the oil and gas leases in suit, to wit: the last day of the month subsequent to the month of actual production, and ending with the effective date of the Journal Entry of Judgment to be filed herein."

The trial court rendered judgment accordingly on the 14¢ per m.c.f. figure for the entire period and this appeal ensued.

Appellant's contention of error respecting the amount of royalty due is capsulized in his brief thus:

"Since plaintiffs' leases require payment of royalty based on market value at the well, and the trial court found from undisputed evidence what that market value was, the court was not at liberty to enter judgment for royalty based on a higher amount which defendant had paid as a premium to other royalty owners in consideration of their accepting the clarifying terms of the defendant's division order and gas purchase agreement."

Appellant concedes his liability for royalty based on that which he asserts was the actual market value of gas in the Reichel field, that is, 13¢ per m.c.f., less reductions, for production up to February 1, 1967, and 14¢ per m.c.f., less reductions, thereafter.

Appellant first points out that the trial court found as follows:

"From the evidence this Court finds that the actual market value at the wellhead in the Reichel field was 13¢ per m.c.f., less proportionate reduction for BTU content below 950 per cu. ft. from date of first production in 1965 to

February 1, 1967, less 1½ per m.c.f. as cost of compression supplied by defendant, and from February 1, 1967, to the present, was 14¢ per m.c.f., less the same reductions. (Testimony of Ford, Bearsley)."

Despite this finding based on undisputed evidence, appellant's argument goes, the trial court found that appellant's payment of 14¢ to other royalty owners established that figure as market value for appellees; continuing the argument, in reaching the latter finding the court used as evidence sales (under the DOGPA) which were so dissimilar as to lack probative value.

Appellees counter that market value is a fact question and they cite the familiar rule on the scope of appellate review—when findings of fact are attacked for insufficiency of evidence this court's function is limited to determining whether there is any competent substantial evidence to support the findings. They assert that which the trial court really did was to find, and properly so, that two separate and distinct markets for gas existed in the Reichel field— one provided by appellant for helium extraction and the other provided by Kansas-Nebraska for heat, fuel and light—between which no parallel existed. The argument is that appellees' gas was dedicated by appellant to his privately-owned project, the first of its kind in the world; appellant as producer sold the gas to himself as purchaser, thereby establishing a unique market.

Appellant replies that appellees' contention the trial court found that two separate and distinct markets existed is fallacious because gas produced in the Reichel field had in fact during the period in question been marketed at the well for purposes of helium extraction, either at the government plant during the time of its operation or at appellant's plant, before the residue was delivered for the ordinary fuel market. As indicated, the material evidentiary facts were undisputed and the trial court did make the findings asserted by appellant.

We believe appellant's contentions are well-founded. First of all, the trial court did not specifically find the existence of two separate markets. It explicitly determined that the actual market value at the wellhead in the Reichel field was 13¢ per m.c.f. less the reductions from date of first production to February 1, 1967, and thereafter was 14¢ per m.c.f., less the same reductions. This finding was derived from the undisputed testimony of two persons —one a buyer of gas with long experience in the Reichel and other fields, and the other with experience as a buyer for a major pipeline and a seller for a large producer, who had made a special study

of the pertinent factors respecting sales in the Reichel field. Both agreed that other than the 14¢ paid by appellant to those signing the DOGPA, the highest price paid in the field was the 13¢ paid by Kansas-Nebraska. Nevertheless, the trial court went on to find that appellant's payment of 14¢ per m.c.f. to other royalty owners established that price as market value for appellees. Concededly, the 14¢ price was paid only to those who executed the DOGPA. Respecting this instrument the trial court found:

"11. . . . It was not a typical division order used in the gas industry in Kansas, in that it did not set forth the owner's interest in the royalty; nor did it state a price or a value per m.c.f. of production; and, in fact it eliminated the landowner's right to use gas produced for residential purposes and tied up his land for twenty years without any regard to production. The agreement constituted an amendment to the Lippert lease which Lippert was free to accept or reject. In the end Lippert and these plaintiffs rejected it."

The trial court further commented:

"15. The defendant's DOGPA was not a standard and typical form of division order as used in the gas industry in Kansas. It constituted a re-write of the parties' underlying oil and gas leases by withholding valuable rights reserved to landowners, as heretofore mentioned.

"16. By the terms of the oil and gas leases in suit, defendant's obligation to pay royalty to plaintiffs each month was absolute and unconditional. The defendant could not by his own unilateral act, not agreed to by plaintiffs, impose conditions precedent to said royalty payment obligation. The plaintiffs did not agree to the execution of defendant's DOGPA as a condition precedent to their right to receive royalty."

It is now well established that market value of property may be shown by independent proof of comparable sales—this on the theory that under our present evidentiary code all relevant evidence is admissible except as otherwise provided by statute; such evidence is relevant and is not statutorily excluded (*City of Wichita v. Jennings*, 199 Kan. 621, 625, 433 P. 2d 351). To be comparable the sales must be similar or under substantially similar conditions. Conversely, sales of property which are not reasonably similar are not relevant because of want of probative value (see *State Highway Commission v. Lee*, 207 Kan. 284, 485 P. 2d 310). Mere similarity as to some particulars is not sufficient where gross dissimilarity exists as to other factors which have a bearing on value. The problem is not free from difficulty but it does appear here the 14¢ paid by appellant under the DOGPA was paid under circumstances substantially different from the market value otherwise shown. The trial court pointed out that the instrument was not

typical of a division order in the field. In several respects it materially altered the lease, going far beyond the ordinary division order the function of which this court described in *Wagner v. Sunray Mid-Continent Oil Co.*, 182 Kan. 81, 92, 318 P. 2d 1039. Whatever benefits it contained went hand in hand with its burdens and the two can scarcely be divorced for the purpose of establishing market value where it is absent. Hence we conclude, and so hold, that the trial court erred in fixing the market value during the period in question upon the price fixed in the DOGPA rather than upon the undisputed evidence and finding of established market value in which the DOGPA was not involved. Obviously nothing herein is to be construed as determining market value beyond the scope of the evidence considered at the time of trial, June 14, 1971.

Appellant challenges the pre-judgment allowance of interest on the royalties found to be owing. On the judgment which was entered October 20, 1971, the trial court allowed interest at the rate of six percent per annum up to July 1, 1967, and at eight percent thereafter.

Just how the trial court arrived at a pre-judgment rate of interest of eight percent effective July 1, 1967, is unclear but in any event such allowance at that rate was erroneous. The judgment rate of interest remained at six percent up until July 1, 1969, by virtue of K. S. A. 16-204; thereafter it became eight percent by reason of Laws 1969, Chapter 114, Section 1, (now K. S. A. 1972 Supp. 16-204). The latter amendment has no retrospective effect *(Bartlett v. Heersche,* 209 Kan. 369, 496 P. 2d 1314) and, of course, does not purport to change the rate of interest allowable prior to judgment.

We turn now to the appellant's challenge to the allowance of any pre-judgment interest. The matter is governed by K. S. A. 16-201 which in pertinent part provides:

"Creditors shall be allowed to receive interest at the rate of six percent per annum, when no other rate of interest is agreed upon, for any money after it becomes due; for money lent or money due on settlement of account, from the date of liquidating the same and ascertaining the balance; . . . for money due and withheld by an unreasonable and vexatious delay of payment or settlement of accounts. . . ."

The trial court made no clear-cut finding as to the reason for the allowance of pre-judgment interest. Appellees have contended throughout that the amount of the royalty due them was liquidated, being that set in 1963 by appellant in his DOGPA. The

holding just reached as to the principal amount due negates that premise, although, despite the dispute, it might as well be argued that interest on the lesser principal amount was likewise proper on the premise an ascertainable market price existed, rendering the account a liquidated one. Beyond this, appellees assert the trial court's award of interest was proper because the royalties were "due and withheld by an unreasonable and vexatious delay of payment or settlement of accounts" under 16-201. We are inclined to agree. The trial court did comment in its findings on appellant's failure to furnish information to appellees as requested and on his failure to do anything toward negotiating settlement with appellees. We think those comments may be fairly construed as findings of unreasonable and vexatious delay of payment or settlement of accounts. All that appellant ever did in the way of accounting or settlement over a long period of time after production had begun was to tender the DOGPA on a take-it-or-leave-it basis. He thus insisted upon that which amounted to a modification of his leases. Although he was under a positive duty under those leases to pay royalty during the period of production he made no tender to appellees under them until long after this lawsuit had been filed. This belated tender included nothing in the way of interest for the long withholding of appellees' money and was ineffectual to terminate liability for interest.

We have examined the authorities cited by appellant in excuse of his failure to make tender of royalties but find none persuasive under the particular circumstances revealed here.

We hold that pre-judgment interest at the rate of six percent per annum should be allowed on the royalties due appellees from the time of their accrual. Accordingly, as thus modified, the judgment is affirmed and the cause is remanded to the trial court with directions to enter judgment in harmony with the views herein expressed.

APPROVED BY THE COURT.