No. 54,534

CARL F. MATZEN, *et al., Appellees/Cross-Appellants,* v. CITIES SERVICE OIL COMPANY and CITIES SERVICE COMPANY, *et al., Appellants/Cross-Appellees.*

(667 P.2d 337)

847

Opinion filed July 15, 1983.

*Robert J. Roth*, of Hershberger, Patterson, Jones & Roth, of Wichita; *Gerald Sawatzky*, of Foulston, Siefkin, Powers & Eberhardt, of Wichita; and *Glenn D. Young, Jr.*, of Gott, Young & Bogle, of Wichita, argued the cause; *Robert F. LeBlanc*, of Tulsa, Oklahoma; *Robert G. Sachse*, of Tulsa, Oklahoma; *Paul N. Kiel*, of Atlanta, Georgia; *John E. Robertson*, of Denver, Colorado; *Richard Jones*, of Hershberger, Patterson, Jones & Roth, of Wichita; *R. H. Landt*, of Denver, Colorado; *Albert D. Hoppe*, of Dallas, Texas; *Douglas C. Brandon*, of Ashland, Kentucky; and *R. Douglas Reagan*, of Foulston, Siefkin, Powers & Eberhardt, of Wichita, were with them on the briefs for appellants/cross-appellees.

*Gerrit H. Wormhoudt*, of Wichita, argued the cause, and *Gregory J. Stucky*, of Wichita, *Bernard E. Nordling* and *Leland E. Nordling*, of Kramer, Nordling, Nordling & Tate, of Hugoton; *Gary R. Hathaway*, of Hathaway & Kimball, of Ulysses; and the firm of *Fleeson, Gooing, Coulson & Kitch*, of Wichita, were with him on the briefs for appellees/cross-appellants.

The opinion of the court was delivered by

MILLER, J.: This is an interlocutory appeal by the defendants in sixteen consolidated class action natural gas royalty cases. The plaintiffs are natural gas royalty owners in Grant, Haskell, Seward and Stevens Counties, and the individual cases were filed in the district courts of those counties, all of which are in the Twenty-sixth Judicial District. The defendants are gas producers who produce and market natural gas from the leases under which the royalties arise. Defendants include Amoco Production Company, Ashland Exploration, Inc., Ashland Oil, Inc., Cities Service Company, Cities Service Oil Company, Columbian Fuel Corporation, Hugoton Plains Gas & Oil Company, Mapco Production Company, Mobil Oil Corporation, Northern Natural Gas Producing Company, and Sinclair Oil Company. All of the natural gas with which we are here concerned was sold in the interstate market.

The plaintiffs brought this suit for additional royalties which they claim on the basis of the "market value" of the gas produced

and sold from 1961 to 1978. During that time, royalties were computed and paid by the defendants on the basis of "proceeds," the amounts actually received by the producers for gas sold. The trial court sustained motions for partial summary judgment, holding (a) that as to "proceeds" leases, the producers had no duty to pay royalties beyond that proportion fixed by the lease of the proceeds actually received from sale of the gas, and (b) that royalty obligations on "market value" leases were not necessarily satisfied by payment of royalties computed by applying the required proportion, usually one-eighth, to the proceeds received from sale of gas.

A consolidated and lengthy trial was held as to holding (b), the purpose of which was to establish the "market value" of natural gas for the relevant period, in order that royalties could be accurately and properly computed. After the presentation of a tremendous volume of evidence, including much expert testimony from both sides of the controversy, the trial court determined that the "market value" of the gas was represented by the highest federally regulated rate for any Kansas gas sold in interstate commerce from the Hugoton field, without regard to "vintaging," during the years covered by the dispute. These prices range from 16¢ per thousand cubic feet (Mcf) in 1961 to $1.51 per Mcf in late 1978, computed at various stated pressures, and with certain BTU adjustments since October 1, 1970. The trial court thus held that royalties on "market value" leases were to be computed and were payable upon the "market value" of the gas, regardless of the actual contract price paid to the producer. The court also made express directions for entry of judgment pursuant to K.S.A. 60-258, and appropriate findings under K.S.A. 1982 Supp. 60-2102(b) to permit the taking of an interlocutory appeal. The producers appeal from the trial court's determination of the royalties due on market value leases. The royalty owners cross-appeal from the trial court's holding that actual proceeds from sale of gas provide the basis for computation of royalties due on "proceeds" leases, and the royalty owners also cross-appeal on certain "special issues" which we will discuss later in this opinion.

## BACKGROUND

These cases arose in the Hugoton gas field in southwest Kansas. When the development of the enormous gas reserves in

that field began more than forty years ago, natural gas pipelines were built so that the gas might be transported to the larger markets and industrial areas of the northeastern United States. In 1938, Congress passed the Natural Gas Act, 15 U.S.C. § 717 *et seq.*, and created the Federal Power Commission (FPC), which was to regulate the price of natural gas sold in interstate commerce. Regulation was accomplished as between producers and interstate pipeline companies in 1954. See *Phillips Petroleum Co. v. Wisconsin,* 347 U.S. 672, 98 L.Ed. 1035, 74 S.Ct. 794 (1954). Long-term natural gas purchase contracts were entered into between the producers and the interstate pipeline companies. These committed production to the interstate market, often for the life of the field.

The FPC, in regulating prices, classified or categorized natural gas based upon the spud dates of the wells or the date the gas purchase contract between producer and pipeline was executed. This is known as "vintaging." The price for gas produced from older wells is established at a lower rate than the price for gas produced from more recent development. This practice continues today under the Natural Gas Policy Act of 1978, 15 U.S.C. § 3301 *et seq.* (Supp. V 1981), which is administered by the Federal Energy Regulatory Commission (FERC).

There was virtually no distinction between the prices paid for gas for interstate and intrastate markets until 1954. After 1954, federal regulation proceeded from individual producer rates (1954-1960), to guideline rates (1960-1969), to area rates (1969-1975), to national rates (1976-1978). The regulation in effect during the time within which we are here concerned, 1961 to November 1978, stems almost entirely from the FPC and the Natural Gas Act of 1938. Almost all of the gas in issue is classified as "old" gas, sometimes called "flowing" gas, and almost all of the leases came into production early in the development of the field. The regulated rates for this gas are significantly lower than the price permitted for "new" gas produced from the same field.

## WAECHTER and LIGHTCAP

This case is a sequel to our decisions in *Waechter v. Amoco Production Co.,* 217 Kan. 489, 537 P.2d 228 (1975), *opinion adhered to after rehearing* 219 Kan. 41, 546 P.2d 1320 (1976), and *Lightcap v. Mobil Oil Corporation,* 221 Kan. 448, 562 P.2d 1, *cert. denied* 434 U.S. 876 (1977), *reh. denied* 440 U.S. 931

(1979). An understanding of those opinions is necessary to the comprehension of the issues presented in the case at bar. Both are lengthy and detailed, and we will not attempt to repeat them fully here. Instead, in capsule form, we will state only the principal issues and their determination which are relevant to this decision.

*Waechter* was a declaratory judgment action brought by some 500 lessors, all in the Kansas Hugoton gas field, against the gas producer, Amoco Production Company. The principal issue, so far as we are now concerned, was whether the lessors were entitled to have royalties computed on a basis of a price greater than that which was actually received by Amoco from the interstate sale of the gas. Although there were many different forms of royalty clauses in the leases, the parties agreed:

"[T]he royalty clause covering most of the approximately 600,000 acres involved and also that upon which all parties will stand or fall, provides as follows:
  " 'Lessee shall pay lessor monthly as royalty on gas marketed from each well one-eighth (⅛) of the *proceeds* if sold at the well, or, if marketed by lessee off the leased premises, then one-eighth (⅛) of the *market value* thereof at the well.' " 217 Kan. at 490. (Emphasis supplied.)

(Leases containing this clause have since been referred to as "*Waechter*" leases.) Lessors were contending that royalties should be computed on the basis of a price of 14.5¢ per Mcf, which price had been determined to be the fair market value of the gas by the district court of Shawnee County in an action between Amoco's predecessor and the purchaser of the gas. See *Pan American Petroleum Corporation v. Cities Service Gas Co.,* 191 Kan. 511, 513, 382 P.2d 645 (1963). That price, however, never went into effect because it was not approved by the Federal Power Commission, and Amoco and the purchaser settled the controversy and agreed upon a lower price which the FPC did approve. Since the gas was being sold by the producer at the wellhead, we held that under the specific terms of the royalty clause set forth above, the lessors were entitled only to royalties computed upon the *proceeds*—the actual sale price of the gas. We distinguished between "proceeds" leases and "market price" leases in the terms of how royalties would be computed. Syllabus ¶ 2 of the *Waechter* opinion reads as follows:

  "An oil and gas lease which provides that the lessee shall pay lessor monthly as

royalty on gas marketed from each well one-eighth of the proceeds if sold at the well, or, if marketed off the leased premises, then one-eighth of the market value at the well, is clear and unambiguous as to gas sold at the wellhead by the lessee in a good faith sale, and lessor is entitled to no more than his proportionate share of the amount actually received by the lessee for the sale of the gas." 217 Kan. at 489.

*Lightcap* was an action instituted by various lessors against the producer of the leases, Mobil Oil Corporation. Mobil had paid royalties based upon the amounts actually received by it from its pipeline customers for the gas sold. Again, we were dealing with interstate gas sales. The plaintiff-lessors sought additional royalties based upon the market value of the gas, which lessors claimed had been determined by arbitration between Mobil and its customers under contracts which called for arbitration of a "fair, just and reasonable" price. As in *Waechter*, the arbitrated price had not been approved by the FPC and was higher than that actually collected by Mobil.

Three types of leases were considered by the court: proceeds leases, market value leases, and *Waechter* leases. A divided court held that under proceeds leases royalties are to be computed upon the actual moneys received by the producer from the sale of the gas; that under market value leases, royalties are to be computed upon the price which would be paid by a willing buyer to a willing seller in a free market, and thus royalties under these market value leases were to be computed based upon the arbitrated price; and that under *Waechter* leases, since the sales of gas were being made at the wellhead, the royalties were to be computed upon the actual sale price received by the producer. We reaffirmed our holding in *Waechter*. The holding of *Lightcap* regarding market value leases is immensely important to the matter at bar. Syllabus ¶¶ 3, 4 and 5 of *Lightcap* read as follows:

"The existence of federal regulation fixing the maximum rate a gas producer may receive from its purchaser is no obstacle to the fixing of a higher rate as the 'market value' of the gas it sells for the purpose of computing royalties.

"Where a lease calls for royalties based on the 'market value' of the gas sold, in the absence of proof of a contrary intent that value is the price which would be paid by a willing buyer to a willing seller in a free market.

"Where a lease calls for royalties based on the 'proceeds' from the sale of gas, the term 'proceeds' means the money obtained from an actual sale and lawfully retained by the seller." 221 Kan. 448.

A major question left undecided by *Lightcap* is one raised

here: How is the free market value of natural gas to be determined in a highly regulated interstate market? The *Lightcap* majority made it clear that the existence of federal price regulation does not prevent setting a higher rate as the market value for the purpose of computing royalties under a lease when it said:

"We hold, therefore, that the existence of federal regulation over the rates which a gas producer may receive is no obstacle to the fixing of a higher rate as the 'market value' of the gas it sells for the purpose of computing royalties." 221 Kan. at 457.

Noting that neither the royalty owners nor the producers involved in *Lightcap* offered any independent evidence of market value, the majority affirmed the trial court "insofar as it awarded royalties on the free market value (*i.e.*, the arbitrated price) of gas sold under those leases which this court categorizes as 'market value' leases . . . ." 221 Kan. at 469. The *Lightcap* majority also said that the "market value" of the gas was subject to proof at trial by any competent evidence. There, however, the royalty owners were content to rely on the arbitrated price as reflective of market value and the producers maintained that the FPC regulated price represented market value. The royalty owners in the case now before us have attempted to prove market value by expert testimony based upon comparable sales (intrastate sales and "new gas" prices), upon comparative prices for alternative competing fuels, and upon an econometric study of demand and supply relationships as to natural gas during the pertinent time periods. The producers, on the other hand, continue to argue that the price of gas within the particular federally regulated category (vintaged or "old" gas) is reflective of market value, and that market value for royalty purposes cannot exceed that regulated price.

## MARKET VALUE

The evidence before the trial court reflects a great diversity of expert opinion as to the "market value" of natural gas. The trial court found the experts for both sides to be equally qualified. Defendants' evidence reflects that the average sale price for gas varied from $0.1098 per Mcf in 1961 to $1.4747 per Mcf in 1978. This evidence was based upon the average applicable FPC prices for the gas produced from these leases during the years in question. Plaintiffs' experts placed the market value from $0.2538 per Mcf in 1961 to $2.8625 per Mcf in 1978, based upon a

comparison of the BTU cost of alternative fuels, and from $0.127 per Mcf in 1964 to $4.25 per Mcf in 1978, based upon an econometric study of demand and supply relationships as to natural gas. Plaintiffs also introduced evidence that the largest intrastate sale of natural gas in Kansas, a contract between Mesa Petroleum and Kansas Power & Light Company, called for prices varying from $0.167975 to $0.26 per Mcf during the target period. Finally, the evidence disclosed that FPC-established prices for "new" gas exceeded those for "old" gas produced in the same field. Evidence of the FPC-regulated prices was presented by defendants' experts.

The trial court determined that the Mesa-KPL contract reflected the depressed prices imposed by the FPC on the interstate market, and that the contract rates for some years were not only below the FPC maximum prices, but were at times even below the FPC minimums. It concluded that those intrastate contract rates did not provide a valid basis for determining market value. The trial court declined to rely upon the expert testimony based upon econometric model projections and alternative fuel costs. It found that the FPC opinions or directives fixing the price of old gas were based upon vintaging, which the court described as follows:

"[M]erely a device for classifying . . . gas produced from previously drilled wells . . . and an artificial way of distinguishing some of the current costs as opposed to older costs in the development of the field. The purpose of this rationale was to justify repression of the prices allowed."

The court then turned to the FPC directives fixing the price for recent or "new" gas. It noted that these were "based upon hearings to determine current costs of exploration and development, and is the best evidence of market value of gas in the Hugoton field on each particular time period." The court ultimately found that the most realistic guide to the market value of natural gas for the period in question was the maximum FPC regulated price, a price at which natural gas was actually being sold in interstate commerce from the Hugoton field. This approach disregards FPC vintaging for the purpose of fixing the market value upon which royalties are to be based. After the trial court announced its decision, counsel were requested to check and verify the "new gas" rates applicable throughout, and did so.

We therefore have no issue as to the specific rates applicable under the trial court's ruling.

In *Lightcap*, we said that market value in a free market was subject to proof at trial by *any competent evidence*. Market value of property may be shown by proof of comparable sales. See *Lippert v. Angle*, 211 Kan. 695, 508 P.2d 920 (1973). The evidence presented by the parties below was all competent evidence of market value—evidence of actual sales of the gas produced, evidence of comparable sales, and expert opinion based upon the sale price of comparable fuels and upon econometric model projections. The trial court pointed out that the validity of the latter "has been well established in the field of economics and is relied on for much governmental and industrial planning."

Natural gas from the Hugoton field has been sold during the period in question at the regulated "old gas" price; gas of the same or similar quality, characteristics, pressure, and BTU content, produced from recently drilled wells, has been sold at the regulated "new gas" price. The evidence does not indicate that any gas, however, has been sold from the Hugoton field in interstate commerce at the fair market values or prices projected by plaintiffs' experts. The trial court, faced with this evidence, found that the "new gas" price was the most reliable indication of market value and adopted that price as the market value of the gas in issue. The trial court's finding is based upon substantial, competent evidence. It is a finding of fact. Ordinarily, we will not substitute our judgment for that of a trial court where the latter's findings of fact are fully supported by the evidence below. As we said in *City of Council Grove v. Ossmann*, 219 Kan. 120, 126, 546 P.2d 1399 (1976):

"Our function on appeal is to determine whether the findings of the trial court are supported by substantial competent evidence . . . and whether the findings are sufficient to support the trial court's conclusions of law. The findings adopted by the trial court will not be set aside unless they are clearly erroneous."

And see *Holmes v. Kewanee Oil Co.*, 233 Kan. 544, 664 P.2d 1335 (1983).

Syllabus ¶ 4 of *Lightcap*, quoted above, provides in substance that the "market value" upon which royalties are to be based under market value leases is that price which would be paid by a willing buyer to a willing seller in a free market. This basic

position is shared by the courts of other jurisdictions. See, for example, *J. M. Huber Corporation v. Denman,* 367 F.2d 104 (5th Cir. 1966) [discussed in *Lightcap,* 221 Kan. at 452-53]; *Foster v. Atlantic Refining Company,* 329 F.2d 485 (5th Cir. 1964); *Montana Power Co. v. Kravik,* 179 Mont. 87, 586 P.2d 298 (1978); *Exxon Corp. v. Middleton,* 613 S.W.2d 240 (Tex. 1981); *Texas Oil & Gas Corporation v. Vela,* 429 S.W.2d 866 (Tex. 1968). And see also Lowe, *Developments in Nonregulatory Oil & Gas Law,* 32d Ann. Inst. on Oil & Gas L. & Tax'n 117, 144 (1981). We are not unmindful that three other jurisdictions have reached the opposite conclusion on this issue, holding that a producer's royalty obligation, under a lease calling for royalties based upon market price or market value, is discharged when the producer enters into an arm's-length, good faith gas purchase contract at the best price available at the time and then pays royalties based upon the proceeds received. See *Hillard v. Stephens,* 276 Ark. 545, 637 S.W.2d 581 (1982); *Henry v. Ballard & Cordell Corp.,* 418 So. 2d 1334 (La. 1982); *Tara Petroleum Corp. v. Hughey,* 630 P.2d 1269 (Okla. 1981). We do not, however, find these cases to be persuasive, nor do we find it necessary to abandon the holding of Syllabus ¶ 4 of *Lightcap.*

Syllabus ¶ 3 of *Lightcap,* quoted above, states in substance the proposition that federal regulation fixing the maximum price a producer may receive from its purchaser is not an obstacle to the fixing of a higher rate as the "market value" of the gas it produces and sells, for the purpose of computing royalties which it is contractually obligated to pay. The cases supporting the holding of Syllabus ¶ 3 are discussed in *Lightcap,* 221 Kan. at 452-55, and what we said there need not be repeated here. We recently reaffirmed the rule stated in both Syllabus ¶¶ 3 and 4 of *Lightcap* in *Holmes v. Kewanee Oil Co.,* 233 Kan. 544. Counsel have argued, and we have not ignored, the several cases which hold that the "legal characteristics" of gas—old or new gas, under applicable federal regulations, for example—may not be overlooked in determining market value and that sales on the unregulated intrastate market or sales of new gas may not be considered comparable sales when determining the market value of old gas or the royalties due under market value leases. See, for example, *Bowers v. Phillips Petroleum Co.,* 692 F.2d 1015 (5th Cir. 1982); *Kingery v. Continental Oil Co.,* 626 F.2d 1261 (5th

Cir. 1980), *cert. denied sub nom. Brent et al. v. National Gas Pipeline Company of America,* 454 U.S. 1148 (1982); *Domatti v. Exxon Corp.,* 494 F. Supp. 306 (W.D. La. 1980); *First Nat. Bank in Weatherford v. Exxon Corp.,* 622 S.W.2d 80 (Tex. 1981); and *Shell Oil Co. v. Williams,* 428 So. 2d 798 (La. 1983). The *Williams* opinion includes the following statement:

"[T]hat market value must be determined by comparable sales in quality which also involve the legal characteristics of the gas, that is, whether it is sold on a regulated or unregulated market." 428 So. 2d at 802.

Regulation of the interstate sales of natural gas is, and was during the time period here involved, an accomplished fact. Strict adherence to *Lightcap* Syllabus ¶ 4 would require that the existence of federal regulation should be wholly disregarded when establishing market value for the purpose of computing royalties. The trial court did not do so; instead, it took the highest regulated price, and rejected evidence of hypothetical market value in a free market, a market which no longer exists. This is a middle-of-the-road approach, and we think one reasonably and prudently taken. Certainly the value of a given quantity and quality of natural gas, produced on adjoining leases, from the same formation, is the same to the royalty owner, the producer, the seller, and the purchaser. The age of the well or the contract of sale matters not to the landowner whose gas is being produced and whose reserves are being reduced, or to the producer or the consumer, who are concerned only with quality and quantity, not origin. In Syllabus ¶ 6 of the opinion in *Holmes,* we said:

"Comparable sales of gas are those comparable in time, quality, quantity and availability of marketing outlets." 233 Kan. 544.

We disagree with the *Williams* rationale, reflected in the quotations above, and hold that quality, as that term is used in defining comparable sales, does not include the "legal characteristics" of the gas resulting from "vintaging." Quality consists of the inherent properties of the gas—BTU content, pressure, and the like. We further hold that, on the evidence presented, the new gas sales considered by the trial court in this action are comparable in quality to the gas sales at issue here. We are not unmindful of the cases cited above, which appear to hold to the contrary. We do not believe, however, that those decisions require the result which defendants seek. The defendants maintain that, under the standards of comparability established by

those decisions, the market value of gas committed to the interstate market cannot be higher than the regulated price ceiling for gas of the same vintage. That conclusion is implicit in the *Bowers, Kingery* and *Domatti* cases. We note, however, that in both the *Kingery* and *Domatti* cases, the courts were faced with situations where the only evidence of comparable sales in the interstate market was the testimony of producers' experts that the market value was the same as the contract price. It, in turn, was the same as the regulated price. See *Kingery*, 626 F.2d at 1265, and *Domatti*, 494 F. Supp. at 314. Thus, the only evidence presented required the result reached by those courts. The *Bowers* court, similarly, was careful to note that its ruling did not mean, in every case, that market value and the contract price (which there equalled the regulated ceiling) were the same. *Bowers*, 692 F.2d at 1020.

This particular record, as noted earlier, contains an abundance of expert evidence designed to show market value. The trial court, after hearing all of the evidence, concluded that the market value of this particular gas is best reflected in the highest regulated price of new gas in the area. We find this approach, which incorporates the holding of *Lightcap* that market value may be higher than the contract price and yet acknowledges that the market is affected by pervasive regulation, is reasonable and is supported by the evidence presented.

Royalties which a producer is required to pay form a part of the producer's operating costs. Consideration of those costs in fixing allowable rates is within the scope and authority of the federal regulatory agency. At least two United States Supreme Court decisions have indicated that a producer who is forced to pay higher royalties on a market value lease may go to the federal regulatory agency and request individual relief from the regulated price which it charges its customers. In *Mobil Oil Corp. v. FPC*, 417 U.S. 283, 328, 41 L.Ed.2d 72, 94 S.Ct. 2328 (1974), Mobil complained that the FPC failed to provide automatic adjustments in area rates to compensate for anticipated higher royalty costs. The court said:

"We agree with the Court of Appeals that Mobil's argument is hypothetical at this stage and that in any event an affected producer is entitled to seek individualized relief. The Court of Appeals said:
" '[W]e are not willing to alter or stay the implementation of area wide rates for the entire industry merely on the basis of what *might* happen to *some* producers' costs  . . . . .

" 'If, as subsequent events develop, the producers are put in a bind by their royalty obligations, they may certainly petition FPC for individualized relief. *Permian [Permian Basin Area Rate Cases,* 390 U.S. 747, 20 L.Ed.2d 312, 88 S.Ct. 1344 (1968)] contemplated it.' 483 F.2d at 911 (emphasis in original)."

The latest discussion of this matter which we have found appears in *FERC v. Pennzoil Producing Co.,* 439 U.S. 508, 58 L.Ed.2d 773, 99 S.Ct. 765 (1979). The producers of certain market value leases, all involving interstate gas, reached a settlement with their lessors in a dispute over the meaning of the term "market value." The settlement provided that royalty payments would be pegged to the intrastate price of natural gas. The settlement was to be binding only if FERC allowed the producers to charge their purchasers a higher rate than the applicable area rate. The producers petitioned FERC for special relief; the Commission concluded that it was not free to allow royalty costs based upon the value of gas in an unregulated market to affect the price which a regulated producer might charge its customers. The Court of Appeals for the Fifth Circuit disagreed and held that FERC was in fact required to grant such relief if so requested, as long as the increase in royalty was not imprudent and the increase, if granted, would merely sustain rather than increase the producers' profits. The United States Supreme Court vacated and remanded, and in a unanimous decision concluded that the Commission is not *required* to grant the requested relief but that it has the power to do so in the exercise of the broad discretion vested in it as a part of its ratemaking function. The court said:

"If the Commission's opinion is to be read as holding that granting an individual producer a rate increase at variance with the established area or national rate in order to accommodate an increase in royalty costs is forbidden by the Act under any circumstance, the Court of Appeals was surely correct in disagreeing with the Commission. In *Permian Basin Area Rate Cases,* 390 U.S. 747 (1968), the Commission urged that 'nothing in the Constitution or in the Natural Gas Act require[s] the Commission to provide exceptions to the area rates,' at least so long as the Commission permitted abandonment when costs exceed revenues, but it nevertheless pointed out that it had established a procedure whereby individual producers may seek relief from the applicable area rate. Brief for the FPC, O.T. 1967, Nos. 90 et al., p. 64. Similarly, in *Mobil Oil Corp. v. FPC, supra,* the Commission, responding to the possibility of certain producers facing higher royalty payments than the fixed percentage of total costs used by the Commission in setting the area rates, stated—in agreement with the Court of Appeals—that 'the issue is hypothetical at this stage and that if it

becomes a reality producers may seek special relief from the Commission.' Brief for Respondent FPC, O.T. 1973, Nos. 73-437 et al., p. 62. This Court proceeded on a similar assumption, saying that 'in any event an affected producer is entitled to seek individualized relief.' 417 U.S., at 328.

"None of the foregoing is consistent with the proposition that the Commission is totally without power to give special relief to individual producers whose escalating royalty costs place them in an untenable position. In view of the scope of the discretion vested in the Commission to establish just and reasonable rates consistent with the public interest, we could not hold that the Act forbids special relief from area rates to accommodate increased royalty costs regardless of the circumstances.

. . . .

"Nevertheless, the Commission's initial opinion and its opinion denying rehearing indicated that it is 'not free' and that 'it does not have the power' to give individualized relief where escalating royalty costs are a function of, or are otherwise based upon, an unregulated market price for the product the sale of which in the interstate market is regulated by the Commission. Erroneously, we think, the Commission sought support for these conclusions in [*FPC v.*] *Texaco*, 417 U.S. [380, 399, 41 L.Ed.2d 141, 94 S.Ct. 2315 (1974)], where we reminded the Commission that '[i]n subjecting producers to regulation because of anticompetitive conditions in the industry, Congress could not have assumed that "just and reasonable" rates could conclusively be determined by reference to market price.' We did not, however, hold, as suggested by the Commission, that it 'has no authority to permit rate increases based on royalty costs tied to the unregulated market for natural gas.' Brief for Petitioner 13; see also *id.*, at 16, 19, 21. Our concern in *Texaco* was that rates of small producers might be totally exempted from the Act, and we did not indicate that producer or pipeline rates would be *per se* unjust and unreasonable because related to the unregulated price of natural gas. *Texaco* did not purport to circumscribe so severely the Commission's discretion to decide what formulas and methods it will employ to ensure just and reasonable rates. Indeed, the decision underscored the wide discretion vested in the Commission. See 417 U.S., at 387-393." 439 U.S. at 514-17.

Defendants indicate that, to their knowledge, such relief has not been granted by the FERC. This may be so, but there is nothing before us to indicate that such relief has been sought by these defendants and denied. The avenue for relief, though untried, remains open. We do not anticipate, as defendants argue, that a producer seeking such special relief must be on the brink of bankruptcy before relief will be granted. The producers have the protection of the Constitution, which prohibits the fixing of rates at a confiscatory level. See *FERC v. Pennzoil Producing Co.*, 439 U.S. at 519.

We adhere to Syllabus ¶¶ 3 and 4 of *Lightcap*, but in addition we hold that evidence of regulated natural gas prices is admissible on the issue of market value and should be considered by a

trial court in determining that issue. The judgment of the trial court in determining market value is based upon substantial, competent evidence, is supported both factually and legally, and will not be disturbed.

## THE COMMERCE and
## SUPREMACY CLAUSE ARGUMENTS

The defendants contend that if the trial court's decision requiring the payment of additional royalties is upheld, the entire federal regulatory structure will be upset. They contend that by allowing increased royalties, the state has invaded the field of natural gas regulation preempted by federal authority, thus violating the commerce and supremacy clauses of the United States Constitution. Federal regulation, however, does not extend to the determination of royalties. As we pointed out in *Lightcap*, it was settled in *Mobil Oil Corporation v. Federal Power Commission*, 463 F.2d 256 (D.C. Cir.), *cert. denied* 406 U.S. 976 (1972), that "the FPC has no jurisdiction over a royalty owner or over a dispute between a royalty owner and his producer as to the amount of royalties payable under a gas lease." 221 Kan. at 450. The arguments made here were fully answered in *Lightcap*, 221 Kan. at 452-57, and in *FERC v. Pennzoil Producing Co.*, 439 U.S. 508, discussed above. We find no merit in them.

## WAECHTER REVISITED

The trial court ruled that, with respect to "proceeds" leases, the defendants' royalty obligations are limited to an accounting for the percentage fixed in the leases of the sale prices or proceeds actually received by the defendants for gas produced and sold. In *Waechter*, we held that under a royalty clause calling for one-eighth of the proceeds if sold at the well, the lessor was entitled to no more than his proportionate share of the amount actually received by the lessee for the sale of gas. Following *Waechter*, we held in *Lightcap* that where a lease calls for royalties based on the proceeds from the sale of gas, the proceeds means the money obtained from an actual sale, and the lessor of a proceeds lease is entitled only to his proportionate share of those proceeds. Plaintiffs, as cross-appellants, contend that lessors in proceeds leases should be paid a percentage of market value. This position was taken by one or more of the dissents in *Waechter* and *Lightcap*. The majority of this court, however, continues to adhere to the majority opinions in both

*Waechter* and *Lightcap*, and we hold that the trial court properly and correctly decided the issue of royalty entitlements of lessors in proceeds leases.

Plaintiffs also contend that lessees receive "hidden consideration" for the sale of gas produced, and that additional royalties are owed upon such consideration. This argument was not emphasized during the trial, and the trial court, apparently unpersuaded, did not mention it in its determination of the issues. The evidence upon which plaintiffs base this claim is scant, and for the most part consists of inferences to be drawn from the cross-examination of defendants' witnesses. Plaintiffs claim that some of the producers negotiated with their purchasers to increase production in the Hugoton field in exchange for development of gas reserves elsewhere, that they reserved liquid extraction rights, and that some contracts for the sale of Kansas gas were tied in with contracts for the sale of gas located outside of the state. Taken at its best, this evidence does not demonstrate calculable income upon which royalties may be computed. Plaintiffs had the burden of proof on this issue and we cannot say that the trial court erred in failing to rule in plaintiffs' favor, considering the modicum of evidence produced.

### SPECIAL ISSUE—*GOOD v. ASHLAND OIL, INC.*

Ashland and its predecessors have maintained and operated a gathering system some 153 miles in length to serve a number of the leases which it produces in the Hugoton field. It transports gas to a central delivery point away from the wells; there it transfers the gas to Cities Service Pipeline. Ashland and Cities Service have entered into a long-term purchase contract, and Ashland pays royalties based upon the proceeds of this gas purchase contract. Ashland receives a gathering fee from Cities Service, which is not included in its royalty calculations. Ashland maintains that the sale takes place at the wellhead, where the gas is metered. The trial court determined that because of Ashland's gathering system, it retains possession and ownership of the gas until it passes to Cities Service at the delivery point. The leases in question are *Waechter* leases, and thus whether the gas is sold at the wellhead or off the premises determines whether royalties are to be determined from proceeds or market value. Ashland maintains that this point is controlled by *Ashland Oil & Refining Company v. Staats, Inc.,* 271 F. Supp. 571 (D.

Kan. 1967) and *Helmley v. Ashland Oil, Inc.*, 1 Kan. App. 2d 532, 571 P.2d 345, *rev. denied* 222 Kan. 749 (1977). We have reviewed both cases and find neither controlling; neither decided the issues before us. The primary holding in *Staats* is that Ashland does not owe royalties upon the gathering charges which it collects from Cities Service. *Helmley*, a class action, was concerned with whether the royalty owners were entitled to interest on certain suspense moneys held by Ashland. Neither case determined the point of sale of gas by Ashland to Cities Service, nor whether the leases were proceeds or market value leases, nor did either determine the market value of the gas.

The trial court's determination that the gas is sold off of the premises, though based upon disputed evidence, is supported by substantial, competent evidence, and we will not disturb that finding.

## SPECIAL ISSUE—*DUDLEY v. AMOCO PRODUCTION COMPANY*

The *Dudley* case, filed in Stevens County, involves the same plaintiff class, the same leases, and the same defendant as were involved in *Waechter*. Amoco argued below and argues here that *Waechter's* conclusion as to "proceeds leases" precludes the finding of the trial court herein. Amoco's basic claim is that *Waechter* determined that *all* of the leases involved in that lawsuit were proceeds leases, and thus Amoco's royalty obligation is to be based on the proceeds actually received from the sale at the well and not upon market value.

The trial court granted summary judgment in favor of the defendants as to all leases classified as "proceeds" leases under *Waechter* and *Lightcap*. The court also held that if the *Dudley* plaintiff class included any members whose leases qualified as "market value" leases under *Lightcap*, that his rulings on market value would be controlling.

In *Waechter*, the litigated claims were stated as follows:

"One claim is to determine whether Amoco as lessee under certain gas leases is obligated to account to the plaintiff-landowners for gas taken during the period June 23, 1961, to June 23, 1966, on the basis of 14.5¢ per thousand cubic feet at 14.65 pounds per square inch absolute instead of the lower prices actually paid to Amoco by the purchaser of the gas. The other claim is to determine whether Amoco is entitled to be repaid for overpayments of royalty it made to the plaintiff-landowners during the period from January 1, 1954, through December 22, 1957 . . . ." 217 Kan. at 490.

Later the opinion says:

"Although, as will be seen later, there are actually forty-eight different forms of royalty clauses in the leases, in somewhat similar language, plaintiffs and Amoco are agreed the royalty clause covering most of the approximately 600,000 acres involved and also that upon which all parties will stand or fall, provides as follows:

" 'Lessee shall pay lessor monthly as royalty on gas marketed from each well one-eighth (⅛) of the proceeds if sold at the well, or, if marketed by lessee off the leased premises, then one-eighth (⅛) of the market value thereof at the well.' " 217 Kan. at 490.

The question here is whether the agreement in *Waechter* precludes any of the lessors from now asserting that their leases are market value leases. *Waechter* determined that all of the sales of gas there involved were made at the wellhead; that issue was litigated, and appears to be res judicata. There was, however, no litigated issue as to whether any of the leases were strictly market value leases. An issue is res judicata when there is a concurrence of four conditions:

"(1) [I]dentity in the things sued for, (2) identity of the cause of action, (3) identity of persons and parties to the action, and (4) identity in the quality of the persons for or against whom the claim is made." *Adamson v. Hill,* 202 Kan. 482, 487, 449 P.2d 536 (1969).

In *Waechter,* the parties sought a declaration of the meaning of the "Waechter" language in the leases and agreed to be bound thereby. They litigated whether that language was ambiguous, or whether it was clear, and whether under the facts such a lease was a proceeds or market value lease. No one sought a declaration that *all* leases involved were "proceeds" leases. The plaintiffs sought a declaration of the meaning of the *Waechter* clause, quoted earlier in this opinion. Thus, it would appear that there was no identity of the things sued for or identity of the cause of action. We conclude that the *Waechter* decision did not determine that all of the leases there involved were proceeds leases. *Waechter* is not res judicata on that issue, and the trial court did not err in its determination thereof.

The judgment is affirmed.

SCHROEDER, C.J., dissenting: My position in these oil and gas lease cases involving the payment of royalties is fully stated in my dissenting opinion in *Waechter v. Amoco Production Co.,* 217 Kan. 489, 521, 537 P.2d 228 (1975); and in my concurring and

dissenting opinion in *Lightcap v. Mobil Oil Corporation,* 221 Kan. 448, 486, 562 P.2d 1, *cert. denied* 434 U.S. 876 (1977), *reh. denied* 440 U.S. 931 (1979),

In my opinion the regulated natural gas price of gas sold in interstate commerce has no relevance in determining the royalty to be paid at the fair market value of the gas sold. The price to be paid should be determined by what a willing buyer would pay a willing seller in a free market at the time of sale. This would require proof of the price paid for gas in the intrastate market when the gas was sold by the lessee producing the gas.