**IMPERIAL COLLIERY COMPANY,**
Plaintiff–Appellee,

v.

**OXY USA INC., (Formerly Cities Service Oil Company),**
Defendant–Appellant.

No. 89–2373.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 31, 1989.

Decided Aug. 24, 1990.

As Amended Sept. 19, 1990.

Rehearing Denied Sept. 24, 1990.

Mark A. Swartz, Kay, Casto, Chaney, Love & Wise, Charleston, W.Va., argued (Dina M. Mohler, Kay, Castro, Chaney, Love & Wise, Charleston, W.Va., on brief), for defendant-appellant.

J. Thomas Lane, Bowles, Rice, McDavid, Graff & Love, Charleston, W.Va., argued (F.T. Graff, Jr., Bowles Rice McDavid Graff & Love, Charleston, W.Va., on brief) for plaintiff-appellee.

Before PHILLIPS, Circuit Judge, BUTZNER, Senior Circuit Judge, and WARD, Senior United States District Judge for the Middle District of North Carolina, sitting by designation.

PHILLIPS, Circuit Judge:

OXY USA, Inc. (formerly Cities Service Oil and Gas Co.) (Oxy) appeals from a judgment awarding compensatory damages

to Imperial Colliery Co. (Imperial) for Oxy's breach of an oil and gas lease between Imperial as lessor and Oxy as lessee. We affirm the district court's determination that Oxy was liable for breach of the lease in the ways alleged, but we vacate a portion of the court's award of damages and remand for further proceedings on the issue of damages.

## I

The basic facts are undisputed.

At all relevant times, Imperial owned and leased to Oxy 2440 acres of oil and gas producing land in West Virginia upon which were located fourteen gas producing wells. This Imperial land was part of a larger 13,000–acre oil producing tract, all of which was subject to a lease created by predecessors in interest in 1944 (1944 Lease). Between 1944 and 1948, Oxy's and Imperial's predecessors in interest completed eighteen wells, four of which were plugged, and fourteen of which produced gas from the leased premises throughout the period in issue.

By the terms of the 1944 Lease, Oxy was required to pay Imperial

one eighth (⅛) of the current wholesale market value at the well for all gas produced ... which wholesale market value is hereby defined to mean the prevailing purchase price currently paid at the well by purchasers of gas at wholesale in the field in which the well is located.

The lease provided for a primary term of ten years, "and as long thereafter as oil or gas is produced therefrom and royalties paid by the Lessee...."

Under the lease, Oxy collected gas from the fourteen Imperial wells and a royalty meter located immediately off Imperial's 2440 acres measured the amount of gas the fourteen Imperial wells produced. After leaving the royalty meter, gas from Imperial's fourteen wells was commingled by Oxy with the rest of the gas produced on the 13,000 acres and piped to Oxy's compressor station, twelve miles from Imperial's 2440 acres. The gas produced on Imperial property was dedicated to interstate commerce by the terms of a 1948 gas sale contract

between Equitable Gas Co. (Equitable) as buyer and Oxy as seller.

Beginning in 1976, Imperial began to express concern to Oxy about alleged royalty underpayments under the 1944 Lease and sought to have Oxy increase its royalty payments. Oxy disputed Imperial's assertions of underpayment and declined. The dispute turned on the question whether the 1944 Lease required royalty payments based upon proceeds from the Oxy–Equitable contract, as Oxy contended, or upon the existing market value for gas, as Imperial contended.

Beginning in 1980, Imperial stopped cashing Oxy's royalty checks, and in 1985 brought this action against Oxy seeking an accounting for the alleged royalty underpayments, lease termination as a consequence thereof, and damages sustained during Oxy's alleged tenure as a holdover tenant after March 3, 1985, when Imperial claimed Oxy's lease was forfeited. During extensive discovery, Imperial allegedly discovered that in 1978 Imperial's wells ceased to be profitable, and amended its complaint to allege that upon that earlier occurrence Oxy's lease was automatically terminated under the provisions of the 1944 Lease. Imperial has contended throughout that Oxy continued operation of unprofitable wells because Oxy's contract with Equitable for gas sold from the entire 13,000 acres was made more profitable if Oxy sold Imperial gas at a loss; by mixing Imperial's lower priced gas with higher priced gas from new wells, Oxy could charge Equitable a lower overall price, thus not jeopardizing its profitable relationship with Equitable.

In a non-jury trial the district court determined that Oxy had underpaid royalties due under the 1944 lease, and that that lease's term had been terminated automatically when the lease ceased to produce in paying quantities in 1978, making Oxy a bad-faith trespasser after that year.

The district court entered judgment and awarded damages in accordance with these determinations of liability. Oxy appealed.

Oxy challenges the court's determinations that Oxy underpaid royalties due under the lease before its termination and that the lease was terminated automatically in 1978 by failure to produce in paying quantities, making Oxy thereafter a bad faith trespasser. Beyond these challenges to determinations of its liability, Oxy challenges the court's assessment of the damages due by reason of any underpayment of royalties owed under the lease, and the measure of damages applied by the court to compensate for its wrongful occupation and use of the premises after 1978.

## II

We first consider Oxy's challenge to the district court's determination that it underpaid royalties due under the lease during the period between 1975 and 1979 when Oxy was indisputably in rightful possession.

As indicated, whether there was any underpayment, hence any liability resulting from this period of the lease's operation, depends upon whether the lease obligated Oxy to pay royalties based on the fair market value of the gas produced or on the proceeds of Oxy's contract with Equitable and, if the former, whether the fair market value was greater than the proceeds value, for Oxy paid royalties on its Equitable contract proceeds throughout this period. Beyond this threshold question of whether there was any underpayment, hence any liability, there is the further issue of how much, which depends on the determination of fair market value during this period.

The district court, reaffirming an earlier pre-trial determination on partial summary judgment, concluded that throughout the period the lease obligated Oxy to pay royalties on the fair market value of the gas produced. The court then determined the fair market value in a precise amount, and because it was greater than the total proceeds value during the period, awarded damages of $23,735.40, representing the difference between the royalties paid and those due under the lease. We find no error in these determinations.

In oil and gas practice, there are two generally used lease clauses dictating the amount of royalties due under a lease: the "market value" clause and the "proceeds" clause. Under a market value clause, royalties are paid based upon the market value of the gas; under a proceeds royalty clause, upon the amount of money received by the lessee upon its sales of gas.

The 1944 lease required Oxy to pay Imperial

one eighth (⅛) of the current wholesale market value at the well for all gas produced ... which wholesale market value is hereby defined to mean the prevailing purchase price currently paid at the well by purchasers of gas at wholesale in the field in which the well is located.

J.A. at 16 (1944 lease).

We do not understand Oxy to contend that this provision is not clearly and unambiguously a market value clause. Rather, as we understand its rather confusing amalgam of arguments, the contention is that a 1971 "division order" had effectively amended the lease to convert the royalty provision into one based on contract proceeds. Beyond this contention that there had been no underpayment, hence no liability, for this period, Oxy contends alternatively that even if the terms of the lease required Oxy to pay royalties on market rather than proceeds value, the proceeds from the Oxy–Equitable contract represented the federally mandated maximum price Oxy could receive for the gas and therefore constituted market value as a matter of law; or that even if the federally mandated maximum gas price was irrelevant to the issue of market value for purposes of computing royalties, the district court improperly computed market value by reference to other factors.

We take these in order.

## A

We consider first the amendment-by-division-order argument.

A "division order" alters lease provisions concerning fund distribution. *See* 4 H. Williams, *Oil & Gas Law* § 701,

572 (1988). The relevant provision in the 1971 division order, in boilerplate, authorized Oxy "to pay for gas produced and marketed at the price at which gas is sold at the wellhead or at the outlet of a separator." J.A. at 46. Oxy's argument that this division order changed the royalty provision of the 1944 lease to a proceeds provision is not the clearest, but as we understand it, it runs as follows. Gas from the Imperial leasehold is not "sold at the wellhead or at the outlet of a separator" as stated in the Division Order and therefore there is no available wellhead price from which to compute royalties. Instead, gas is sold after compression and gathering. Accordingly, because everyone knew that the gas was sold after compression and gathering, and because there were no available wellhead price figures, and because the Division Order speaks in terms of "price at which gas is sold," the parties must have intended for the Division Order to require that royalties would be paid on the basis of the price at which the gas was sold under the Oxy–Equitable contract.

First off, that there was no available wellhead price does not necessarily preclude computation of the gas' wellhead price. For example, Imperial's witness Malcolm testified that such a computation might simply be made by taking Equitable's purchase price and deducting compression and gathering expenses. Moreover, the record amply supports the inference that the division order was executed after Imperial's acquisition of the leasehold with the purpose merely to change the recipient of the royalty payments. See J.A. at 138–47. Nowhere did either party express any intention to change the royalty terms of the 1944 lease, nor is there any consideration that would support such a unilateral agreement by Imperial to accept such a reduction in royalty payments. Indeed, there is no record evidence that Oxy ever relied on the Division order to support this proposition until it raised the point in this litigation. The district court declined to find on the basis of boilerplate language on the reverse of a document intended primarily to change royalty recipients, that the parties to this lease intended to change

the 1944 lease from a market value to a proceeds contract. Its finding to the contrary is not clearly erroneous.

## B

We next consider Oxy's fall-back arguments that the district court's determination of market value of the gas extracted was erroneous. Three arguments are made.

■ First, it is claimed that the district court erred by applying a "willing buyer-willing seller" analysis. Under this analysis, market value is computed by ascertaining the price that a willing buyer would pay a willing seller in a free market without regard to federal gas-price regulation. See 3 E. Kuntz, *Treatise on the Law of Oil & Gas*, § 40.4(d), 329 (1989). Oxy argues that, instead, the district court should have computed market value by reference to federally regulated price maxima.

Second, Oxy asserts that, even if the district court correctly applied the "willing buyer-willing seller" analysis, computation of market value by reference to prices received for gas produced on the property immediately adjacent to Imperial's property (hereafter referred to as Consolidated property) was error because Consolidated gas' characteristics were different from Imperial gas' characteristics.

Finally, Oxy argues that the district court took into account too few wells in computing average market value.

We find no merit in any of these contentions.

### (1)

■ Implicit in Oxy's assertion that the district court improperly failed to consider federal gas price regulation in computing market value is that market value computations for the purpose of computing damages arising from breach of the Imperial–Oxy lease are somehow tied to the price Oxy had negotiated in its contract with Equitable. This negotiated price, argues Oxy, constituted the federal maximum. Put another way, Oxy's argument is that,

because of federal regulation, proceeds value must be the relevant market value. This is not necessarily correct, and courts considering the question are divided on it. Some have held that the federally regulated maximum for gas of similar legal characteristics forms the basis for determining market value of gas sold in interstate commerce. *See, e.g., Bowers v. Phillips Petroleum Co.*, 692 F.2d 1015, 1021 (5th Cir. 1982) (applying Texas law: market value for royalty purposes cannot exceed the maximum ceiling price imposed on the gas within that particular federally regulated category). Others have held that federally regulated prices are irrelevant to the issue of determining market value under the lessor-lessee contract. *See, e.g., Matzen v. Cities Service Oil Co.*, 233 Kan. 846, 667 P.2d 337, 344 (1983) (rejecting *Bowers*). These latter courts have looked, as did the district court here, to the price that a willing buyer would pay a willing seller in a free market without reference to federal price maxima.

The primary difference between the approach taken by *Matzen* and that taken by *Bowers* is that *Matzen* considers only the physical characteristics of the gas for the purpose of computing market value. *See Matzen*, 667 P.2d at 345 ("quality, as that term is used in defining comparable sales, does not include the 'legal characteristics' of the gas"). Conversely, *Bowers* looks to the legal characteristics of the gas in computing its market value. Although West Virginia has yet to choose one of these approaches to the exclusion of the other, we need not decide which market value analysis West Virginia would apply. Whether we apply the *Bowers* or *Matzen* approach is ultimately irrelevant because, under either approach, the district court's market value computations were correct in law and not clearly erroneous in their factual components.

Oxy does not dispute that Consolidated gas, the price of which the district court used in computing market value, had the same physical characteristics as gas produced on Imperial's land. The argument is that under the *Bowers* approach gas produced on the two different properties had

different legal characteristics, were subject to different federally regulated maximum prices, and therefore constituted an improper cost comparison. We reject Oxy's argument.

The Natural Gas Policy Act classifies natural gas by reference to several categories. Imperial's gas was classified as both § 104 and § 108 gas. Section 104 gas is gas that had been committed to interstate commerce on November 8, 1978, and "for which a just and reasonable rate under the Natural Gas Act was in effect on such date." 15 U.S.C. § 3314(a). Under § 104, a natural gas seller like Oxy would negotiate a rate with a buyer like Equitable and submit the rate for a Federal Energy Regulatory Commission (FERC) determination that the rate was just and reasonable. *See* 15 U.S.C. § 717c. Thus, the "maximum rate" of gas classified as § 104 gas is simply whatever contractually negotiated rate FERC deems just and reasonable. Section 108 gas on the other hand, is gas committed to interstate commerce extracted from a "stripper" well. *See* 15 U.S.C. § 3318(a). A stripper well is a well capable of efficiently producing no more than some FERC promulgated maximum. *See* 15 U.S.C. § 3318(b). Both Consolidated and Imperial gas were classified under § 108.

We may first assume, without deciding, that West Virginia would apply the *Bowers* analysis and consider the FERC maximum price as the market value. In *Bowers*, plaintiff lessors sued their lessees seeking additional royalties under their leases. The lease obligated the lessee to pay royalties of one-eighth of the gas' market value at the well. Although the lessors received royalties at least equal to one-eighth of the maximum lawful ceiling prices, the lessors nevertheless sued to recover additional royalties because the maximum lawful ceiling did not constitute market value under the terms of the lease. In rejecting the lessor's claim, the *Bowers* court stated that although the FPC (now FERC) lacked authority to regulate the amount of royalty paid by the lessee producer to the lessor, *see id.* at 1017 (citing *Mobil Oil Corp. v. Federal Power Comm'n*, 463 F.2d 256

(D.C.Cir.1971)), "federal regulation of price implicitly affects the amount of royalties based upon the market value of the natural gas produced and sold by the lessee." *Id.* Thus, market value is to be determined "using only comparables with the same 'legal characteristics' of the natural gas in question, such as sales 'in one particular category of a regulated market ... with marketing outlets similar to the gas in question.'" *Id.* at 1019 (quoting *First Nat'l Bank in Weatherford v. Exxon Corp.,* 622 S.W.2d 80, 81 (Tex.1981)). Accordingly, market value for royalty purposes cannot exceed the maximum ceiling price imposed on the gas within that particular regulated category. *See id.* at 1021.

Oxy argues that, because its gas had been classified under § 104, Oxy was charging the FERC maximum and therefore Imperial gas' market value equalled the price filed with FERC—the price under the Equitable contract. We cannot agree. At any time relevant to this controversy, Oxy could have sought a rate increase for Imperial's gas under 15 U.S.C. § 717c, or an abandonment of the Equitable contract under 15 U.S.C. 717f, in which case Oxy could obtain another buyer subject to the rates established for § 108 gas.[1] Oxy never made such an effort. Moreover, *Bowers* simply does not support Oxy's position. Implicit in *Bowers* was that the gas could not legally be classified under any category other than § 104. Thus, the *Bowers* plaintiffs had no other category into which their gas might be classified and there was no discussion concerning whether abandonment was desired or available. In the instant case, Imperial's gas was classified under § 108 as well as § 104. Had Oxy abandoned the Equitable contract, Oxy might very well have been able to negotiate to sell Imperial's gas under the FERC § 108 price. The *Bowers* court was careful to note that its ruling did not mean in every case that market value and the contract price (which in *Bowers* equalled the regulated ceiling) were the same. *See Bowers,*

692 F.2d at 1020 (if lessee is receiving less than maximum ceiling price, then lessor would be permitted to prove that comparably classified gas included gas sold at the regulated maximum).

Oxy, relying upon *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 573, 101 S.Ct. 2925, 2928, 69 L.Ed.2d 856 (1980) (ARKLA), responds that the "filed rate doctrine" precludes this court from considering whether FERC might have approved a higher price under the Equitable contract. The filed rate doctrine prohibits a federally regulated natural gas seller from charging rates higher than those on file with FERC. *See ARKLA,* 453 U.S. at 573, 101 S.Ct. at 2928. Moreover, "[n]o court may substitute its own judgment on reasonableness [of gas prices] for the judgment of the Commission." *Id.* at 577, 101 S.Ct. at 2930. Nevertheless, the filed rate doctrine simply has no relevance to the instant case. " 'The considerations underlying the doctrine ... are preservation of the agency's primary jurisdiction over reasonableness of rates and the need to insure that regulated companies charge only those rates of which the agency has been made cognizant.'" *Id.* (quoting *City of Cleveland v. Federal Power Comm'n,* 525 F.2d 845, 854 (D.C.Cir.1976). Although FERC's jurisdiction extends to the rates Oxy may charge Equitable for Imperial's gas, FERC lacks jurisdiction over disputes concerning gas leases. *See Mobil Oil Corp. v. Federal Power Comm'n,* 463 F.2d 256, 258–59 (D.C.Cir.1971). Accordingly, even if FERC price maxima are relevant, the filed rate doctrine simply fails to preclude our consideration that, had Oxy applied, FERC might well have increased the price Equitable paid Oxy for Imperial's gas.

### (2)

This leads to the question whether the trial judge erred in computing market value based upon comparison with Consolidated gas value. Oxy does not dispute,

---

**1.** Section 717f(b) provides that:
No natural-gas company shall abandon ... any service rendered by means of [facilities subject to FERC jurisdiction] without the per-

mission and approval of the Commission ... after ... a finding by the Commission ... that the present or future public convenience or necessity permit such abandonment.

and Imperial's expert testified, that Consolidated gas and Imperial gas shared the same physical characteristics. *See* Transcript at 482–83. Additionally, the expert testified that Consolidated wells and Imperial wells were both stripper wells classified under § 108, and that they shared the same legal characteristics for pricing purposes. *See* Transcript at 492–97. Accordingly, we hold that, regardless of whether West Virginia would apply *Bowers* or *Matzen*, Consolidated gas prices were both a physically and legally relevant comparison and we therefore see no error in the district court's use of this comparative price in determining fair market value.

#### (3)

We look finally at Oxy's claim that the district court erred in its market value determination by failing to consider a sufficient number of wells for comparative purposes. The 1944 lease stated that "wholesale market value is hereby defined to mean the prevailing purchase price currently paid at the well by purchasers of gas at wholesale in the field in which the well is located." J.A. at 16 (1944 lease). Oxy argues that, by computing royalties based only upon comparison with royalties received for Consolidated gas, the district court considered too few wells and therefore could not properly have computed "the prevailing purchase price currently paid at the well by purchasers of gas at wholesale in the field in which the well is located." Again, Consolidated gas had the same legal and physical characteristics as Imperial gas. Nothing in the record suggests that such making a comparison was clearly erroneous.

#### III

We next consider Oxy's challenges to the district court's determination that the lease automatically terminated at the end of 1978 by reason of its failure during that year to produce in paying quantities, and the court's resulting award of damages for Oxy's continued occupation and use of the leasehold premises after the lease's termination.

#### A

Oxy first contends that the court erred in determining that the lease automatically terminated by its terms at the end of 1978.

The 1944 Lease provided for an initial ten-year lease period, after which the lease would remain in force "as long thereafter as oil or gas is produced therefrom and royalties paid by the lessee." The term "produced" as used in this context has been construed under controlling state law to mean produced in paying quantities, that is, at a profit. *See Goodwin v. Wright*, 163 W.Va. 264, 255 S.E.2d 924, 926 (1979).

Oxy asserts that the district court made three predicate errors in concluding that the 1944 Lease ceased in 1978 to produce in paying quantities.

First, Oxy argues that the district court erred in its determination, applying West Virginia law, whether the 1944 Lease was producing in paying quantities. Rather than determining productivity by reference to the productivity of the entire lease, Oxy argues that the district court should have determined whether any single well operated at a profit; if so, the lease produced in paying quantities regardless of whether the entire operation lost money.

Second, Oxy argues that the trial court abused its discretion by excluding expert testimony which would have shown that the Imperial lease was in fact operating at a profit.

Third, Oxy argues that the district court erred by including improper cost items in its productivity analysis. We address each of these contentions in turn.

#### (1)

In analyzing whether the court erred as a matter of law in determining that the 1944 Lease stopped producing in paying quantities in 1978, it is necessary to consider an oil and gas lease's objects and purposes. Such leases typically provide in a habendum clause for a primary lease term with provision for the lessee to continue production thereafter so long as the lease remains productive. The lease here

in issue so provided. The object of the primary term is to allow the lessee to secure development of the oil-bearing property. *See Goodwin v. Wright,* 163 W.Va. 264, 255 S.E.2d 924, 925–26 (1979) (citing *Garcia v. King,* 139 Tex. 578, 164 S.W.2d 509, 511 (1942). The purpose of the habendum clause is to allow lessees to reap the full fruits of their development during the lease's primary term. *See id.* Thus, because the objective of the lease " 'is not merely to have oil or gas flow from the ground but to obtain production that is commercially profitable to both parties,' " *id.* (quoting 3 *Williams on Oil & Gas Law* § 604.5), "a lessor cannot remain bound to [a] lease when it does not pay." *Id.*

■ Oxy's specific assertion is that, so long as one well on a lease operates profitably, the condition for continuation of the lease is satisfied. This is clearly not the result that *Goodwin* envisions. The *Goodwin* court spoke in terms of the *lease's* profitability, not that of any single well. Furthermore, the *Garcia* court held that paying quantities means paying quantities to the *lessee. See Goodwin,* 255 S.E.2d at 926 (citing *Garcia,* 164 S.W.2d at 512). Oxy relies upon the following language in *Lowther Oil Co. v. Miller–Sibley Oil Co.,* 53 W.Va. 501, 44 S.E. 433, 436 (1903), to support the proposition that any one well producing in paying quantities is sufficient to keep an overall unprofitable lease alive: "If the well pays a profit, even small, over operating expense, it produces in paying quantity, though it may never repay its cost and the operation as a whole, may result in a loss." This argument is without merit. The cases Oxy relies upon to support this argument are cases involving the production of only one well. *See West v. Russell,* 12 Cal.App.3d 638, 90 Cal.Rptr. 772 (1970); *Blausey v. Stein,* 61 Ohio St.2d 264, 400 N.E.2d 408 (1980); *Hininger v. Kaiser,* 738 P.2d 137 (Okla.1987); *Henry v. Clay,* 274 P.2d 545 (Okla.1954); *Lowther Oil Co.,* 53 W.Va. 501, 44 S.E. 433 (1903). No cited case suggests that this isolated language was intended to have the meaning asserted by Oxy.

Given *Goodwin's* clear emphasis on the lease's productivity as opposed to that of individual wells on leased premises, we find no error in the district court's holding that the entire Imperial lease had to produce gas in paying quantities in order to survive automatic lease termination by operation of the habendum clause.

Oxy alternatively argues that West Virginia law determines paying quantities by reference to the subjective good faith judgment of the lessee. Although no West Virginia cases have addressed the relevance of the lessee's good faith judgment concerning profitability, states which have only consider the lessee's good faith in the context of sporadically or marginally producing wells. *See, e.g., Clifton v. Koontz,* 160 Tex. 82, 325 S.W.2d 684, 691 (1959) ("In the case of a marginal well, ... the standard by which paying quantities [are] determined is whether or not under all the relevant circumstances a reasonably prudent operator would, for the purposes of making a profit and not merely for speculation, continue to operate...."). Oxy nowhere asserts that this was a marginal well situation such as to trigger an inquiry into Oxy's good faith. Accordingly, assuming that West Virginia would apply this "marginal well" rule, it would not be applicable here.

### (2)

■ We next consider Oxy's assertion that the district court abused its discretion by excluding the testimony of Oxy's expert witness, Mike Neumann. Oxy contends that this testimony would have shown that Imperial's wells in fact produced in paying quantities. Imperial presented its case in chief beginning in April 1988. Upon its conclusion, Oxy delivered to Imperial over one thousand pages of cost information which Imperial had requested in 1986, and proffered Neumann as an expert witness to explain it. The district court concluded that the manifest unfairness to Imperial resulting from allowing Oxy to introduce such evidence withheld until after Imperial had presented its case in chief required its exclusion. We find no abuse of discretion on this score. *Cf. Western Reserve Oil &*

*Gas Co. v. Key Oil, Inc.,* 626 F.Supp. 948, 949 (S.D.W.Va.1986).

### (3)

▮ We turn finally to Oxy's assertion that the trial judge considered improper cost factors in computing paying quantities. In West Virginia, proper cost items to be considered in the profit analysis include costs of operations, but not capital expenditures. *See Lowther Oil Co. v. Miller–Sibley Oil Co.,* 53 W.Va. 501, 44 S.E. 433, 436 (1903) ("If the well pays a profit, even small, over operating expense, it produces in paying quantity, though it may never repay its cost, and the operation as a whole may result in a loss."). The district court applied the proper legal standard in determining profitability, holding that "costs [included in the profit-loss analysis] are operating costs and would not include any cost of drilling or other capital expense."

Because the district court applied the proper legal standard, our review is limited to determining whether the district court's ensuing findings of fact are, as Oxy alleges, clearly erroneous. *See Anderson v. City of Bessemer City,* 470 U.S. 564, 572, 105 S.Ct. 1504, 1510, 84 L.Ed.2d 518 (1985).

▮ The district court based its productivity analysis on two models. The first model (the "Malcolm" model) computed costs for each of the Imperial wells. The second model (the "Malcolm/Oxy" model) was based upon Oxy's actual costs provided by Oxy from 1983–1987. Oxy could provide no cost figures from 1978–1983. Finally, the district court had before it Oxy's own internal memoranda admitting that Imperial's wells had operated at a loss since 1978.[2] Under any model, it is clear that, beginning in 1978, Imperial's wells were operating overall at a significant loss. Oxy points to nothing in the record that leaves this court with the "definite and

firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Indeed, Oxy's conclusory allegations that Imperial's expert included improper cost data is simply unsupported by the record. It is clear that the trial judge was aware that capital costs could not be included in cost data, and it is equally clear that such costs were not included by Imperial's expert. Moreover, Oxy never produced actual expense figures during discovery, and as noted above, the district court properly excluded those expense figures that Oxy produced after Imperial's case in chief.

Accordingly, we affirm the district court's finding that the 1944 Lease ceased producing in paying quantities in 1978, and that the lease automatically terminated at that year's end.

### B

Having affirmed the district court's conclusion that the secondary term of the lease automatically expired in 1978 when it stopped producing in paying quantities, we turn to the issue of the damages awarded by the court for Oxy's continuation thereafter in possession and use.

▮ The court awarded as damages for this wrongful possession and use the sum of $1,378,384.60. This represented the market value of all the gas found to have been extracted by Oxy following the lease's automatic expiration. In computing this item of damages, the court applied the West Virginia rule that a bad faith trespasser on an oil and gas leasehold is liable for the fair market value of all the resource extracted, without any reduction for removal costs. *See Reynolds v. Pardee & Curtin Lumber Co.,* 310 S.E.2d 870, 875 (W.Va.1983).[3]

---

**2.** *See* J.A. at 348 (Oxy interoffice letter) ("We have continued to produce [the Imperial] lease, despite the fact that it operated $1,279 in the red in 1978."); J.A. at 416 (Oxy interoffice letter) ("[Imperial's] wells ... have incurred $2600 worth of losses in 1979."); J.A. at 418 (Oxy

interoffice letter) ("losing money" in 1981). *See also* J.A. at 426, 421, 437, 419, 425.

**3.** In contrast, the measure of damages for minerals removed by an innocent trespasser is the value of the mineral in-place, that is, after deduction for mining and hauling. *See Pan Coal*

Oxy contends that this was not the proper measure of damages under West Virginia law, that the proper measure was that applicable to holdover tenants: fair rental or royalty value of the leasehold for the period of the holdover, plus any special damages proven.

We agree with Oxy. This is indeed the proper measure of damages applicable to holdover tenants under West Virginia law, which is in accord with the general American rule. *See Bethlehem Steel Corp. v. Shonk Land Co.*, 169 W.Va. 310, 288 S.E.2d 139, 147–49 (1982) (applying rule to oil and gas lease); *Lewis v. Welch Wholesale Flour & Feed Co.*, 96 W.Va. 694, 123 S.E. 801, 802–03 (1924) (applying as general rule to surface lease); *see generally Restatement, Second, Property* §§ 14.5, 14.6 (stated as general American rule); 1 *American Law of Property* § 3.36 (same). This measure of damages, reflecting the underlying wrong in the holdover tenant situation as being a breach of contract, *see Lewis*, 123 S.E. at 802, is simply different from the tort measure applicable to a trespass by a third-party tortfeasor, stranger to the lease. *See, e.g., Reynolds*, 310 S.E.2d at 875 (differentiating measures applicable to "good faith" and "bad faith" trespasses by third-party tortfeasors). The district court erred in applying the third-party trespasser measure, and this aspect of the damage award must therefore be vacated and remanded for reconsideration.

In reconsidering the proper award of damages under the applicable holdover tenant rule, the district court will have to determine the fair royalty value of the leasehold during the holdover period, deduct from that figure the amount of royalties paid during the period, *see Lewis*, 123 S.E. at 802, and then add any special damages that Imperial may be able to prove under the relevant rule. *See id.* at 802 (special damages limited to those reasonably "in contemplation" of the parties, at the time of lease's formation). In determining the fair royalty value of the lease for the holdover period, the court will be guided by our discussion of the fair market value of the gas produced, as that bears upon the fair royalty value of the leasehold during the holdover period. Because the question of special damages has not yet been developed in evidence, we express no opinion on what might be shown on remand.

### IV

■ Finally, Oxy asserts that, because Imperial cashed royalty checks between 1976 and 1980, Imperial is estopped to assert its claims. We reject this contention. There is abundant record evidence that Imperial patiently and diligently sought to negotiate a just conclusion to this dispute.

### V

Accordingly, we affirm the district court's judgment except insofar as it awards damages for the period of Oxy's holdover tenancy after January 1, 1979. That portion of the judgment is vacated, and the case is remanded for redetermination, in accordance with Part III–B of this opinion, of the amount of damages recoverable for Oxy's occupation and use of the leasehold premises after that date.

SO ORDERED.

Co. *v. Garland Pocahontas Coal Co.*, 97 W.Va. 368, 125 S.E. 226, 230 (1924).